UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse  40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

MOTION INFORMATION STATEMENT

Docket Number(s): 23-1118 (L) & 23-1116 (XAP)      Caption [use short title]

Motion for: Leave to File Amicus Brief

Set forth below precise, complete statement of relief sought:

Leave to file as Amici Curiae on behalf of

Consumer Data Industry Association &

Professional Background Screening Association

pursuant to Federal Rule of Appellate Procedure 29(a)(3).

Connecticut Fair Housing Center, et al.,

Plaintiffs - Appellants/Cross-Appellees,

v.

CoreLogic Rental Property Solutions, LLC,

Defendant- Appellee/Cross-Appellant.

MOVING PARTY: CDIA, et al., Amici Curiae    OPPOSING PARTY: Appellants Connecticut Fair Housing Center, et al.

☐ Plaintiff      ☐ Defendant

☐ Appellant/Petitioner      ☐ Appellee/Respondent

MOVING ATTORNEY: Jennifer L. Sarvadi    OPPOSING ATTORNEY: Christine Webber, Esq.

[name of attorney, with firm, address, phone number and e-mail]

Hudson Cook, LLP        Cohen Milstein Sellers & Toll PLLC,

1909 K. Street, N.W., Ste. 400, Washington DC 20006    1100 New York Ave., N.W. Ste. 500, Washington D.C. 20005

(202) 715-2002   jsarvadi@hudco.com    (202) 408-4600  cwebber@cohenmilstein.com

Court- Judge/ Agency appealed from: U.S. District Court for the District of Connecticut

Please check appropriate boxes:

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes ☐ No (explain): _____
See attached.

Opposing counsel's position on motion:
☑ Unopposed ☐ Opposed ☐ Don't Know
Does opposing counsel intend to file a response:
☐ Yes ☐ No ☑ Don't Know

FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:
Has this request for relief been made below?   ☐ Yes ☐ No
Has this relief been previously sought in this court?   ☐ Yes ☐ No

Requested return date and explanation of emergency: _____

Is the oral argument on motion requested?   ☐ Yes ☑ No (requests for oral argument will not necessarily be granted)

Has the appeal argument date been set?   ☐ Yes ☑ No  If yes, enter date:_____

Signature of Moving Attorney:

_____ Date: 2/23/2024    Service : ☑ Electronic ☐ Other [Attach proof of service]

Form T-1080 (rev. 10-23)

# 23-1118(L)
## 23-1116 (XAP)

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

---

CONNECTICUT FAIR HOUSING CENTER, CARMEN ARROYO,
individually and as next friend for Mikhail Arroyo,
*Plaintiffs-Appellants-Cross-Appellees,*
v.
CORELOGIC RENTAL PROPERTY SOLUTIONS, LLC,
*Defendant-Appellee-Cross-Appellant.*

---

Appeal from the United States District Court for the District of Connecticut
No. 18-CV-705

---

**MOTION FOR LEAVE BY CONSUMER DATA INDUSTRY
ASSOCIATION AND PROFESSIONAL BACKGROUND SCREENING
ASSOCIATION TO FILE BRIEF AS *AMICI CURIAE* IN SUPPORT OF
DEFENDANT/APPELLEE-CROSS-APPELLANT**

---

JENNIFER L. SARVADI
HUDSON COOK, LLP
1909 K Street, NW, 4th Floor
Washington, DC 20006
(202) 715-2002
jsarvadi@hudco.com

1

Pursuant to Federal Rule of Appellate Procedure 29(a), and Local Rule 29.1, the Consumer Data Industry Association ("CDIA") and the Professional Background Screening Association ("PBSA") (together, CDIA and PBSA are "Proposed *Amici*") respectfully move for leave to file the attached brief in support of Defendant/Appellee-Cross-Appellant CoreLogic Rental Property Solutions, LLC's ("CoreLogic") and in opposition to Plaintiffs/Appellants-Cross-Appellees' appeal of the trial court's decision.[1]

Counsel for Proposed *Amici* has consulted with counsel for the parties, and all have consented to this motion.

## I.     Identify of Moving Parties

CDIA is a trade association representing consumer reporting agencies, including the nationwide credit bureaus and various regional and specialized credit bureaus, among others. Founded in 1906, CDIA promotes the responsible use of consumer data to help consumers achieve their financial goals, and to help businesses, governments and volunteer organizations avoid fraud and manage risk. Through data and analytics, CDIA members empower economic opportunity, helping ensure fair and safe transactions for consumers, facilitating competition, and

---

[1] On February 22, 2024, Proposed *Amici* filed a Motion for Extension of Time to File Brief of *Amici Curiae*, requesting an extension to March 1, 2024 (Dkt. 72). Proposed Amici hereby withdraw that motion as moot.

expanding consumers' access to financial and other products suited to their unique needs.

PBSA is a trade association representing the interest of over 650 companies offering employment and tenant background screening services worldwide. Founded in 2003, PBSA promotes a responsible and high level of ethics and performance standards for the employment and tenant screening industry. By conducting millions of employment-related and tenant background checks each year as part of the hiring and leasing process, PBSA members help facilitate complete and accurate checks for employers and landlords throughout the country.

## II.    Statement of Relief Sought

CDIA and PBSA request permission to file a brief as A*mici curiae* in support of CoreLogic's opposition to Plaintiffs/Appellants-Cross-Appellees' appeal of the trial court's decision in favor of Defendant/Appellee-Cross-Appellant. As a "friend of the court," it is the role of an amicus curiae to submit briefing designed to assist the court in cases of general public interest, supplement the efforts of counsel, and draw the court's attention to law that might otherwise escape consideration. An amicus brief may be allowed when the amicus has unique information or perspective that can assist the court. *See, e.g.*, *Ryan v. CFTC*, 125 F.3d 1062, 1062-63 (7th Cir. 1997); *Miller-Wohl Co. v. Comm'r of Lab. & Indus. State of Mont.*, 694 F.2d 203, 204 (9th Cir. 1982); 4 Am. Jur. 2d Amicus Curiae § 3 (updated May 2022).

### III.  Issues to Which the *Amicus Curiae* Brief will be Directed

Proposed *Amici's* members provide tenant screening reports like the one at issue in this case, and would be directly impacted by a ruling on the primary issue before the Court; namely, whether tenant screening companies "make housing unavailable" when providing consumer reports such that they would be deemed subject to the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.* Proposed *Amici's* members are also subject to the duty to provide file disclosures to consumers under the Fair Credit Reporting Act. *See* 15 U.S.C. § 1681g. The question as to when and under what conditions such file disclosures must be provided, and whether liability exists under the FCRA for the alleged failure to do so, are of keen interest to Proposed *Amicis'* membership. Proposed *Amici* have longstanding industry knowledge regarding all of these practices, and recognize that these issues could have wide-ranging impacts well beyond the parties in this case.

Accordingly, CDIA and PBSA respectfully request that the Court grant this motion and permit them to file the attached Brief of *Amicus Curiae,* attached as an exhibit to this motion.

Dated: February 23, 2024        Respectfully submitted,

HUDSON COOK, LLP

*/s/ Jennifer L. Sarvadi*
Jennifer L. Sarvadi
1909 K Street, N.W., 4th Floor
Washington, D.C. 20006
(202) 715-2002
jsarvadi@hudco.com

*Counsel for Proposed Amici Curiae*
*Consumer Data Industry Association*
*Professional Background Screening*
*Association*

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of February 2024, I electronically filed the foregoing Motion for Leave by Consumer Data Industry Association and Professional Background Screening Association to File Brief as *Amici Curiae* in Support of Defendant/Appellee-Cross-Appellant with the Clerk of this Court using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished using the CM/ECF system.

Dated: February 23, 2024        HUDSON COOK, LLP

By */s/ Jennifer L. Sarvadi*

Jennifer L. Sarvadi

# 23-1118(L)
# 23-1116 (XAP)

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

CONNECTICUT FAIR HOUSING CENTER, CARMEN ARROYO,
individually and as next friend for Mikhail Arroyo,

*Plaintiffs-Appellants-Cross-Appellees*

v.

CORELOGIC RENTAL PROPERTY SOLUTIONS, LLC,

*Defendant-Appellee-Cross-Appellant*.

Appeal from the United States District Court for the District of Connecticut
No. 18-CV-705

**BRIEF OF *AMICI CURIAE* CONSUMER DATA INDUSTRY
ASSOCIATION AND PROFESSIONAL BACKGROUND SCREENING
ASSOCIATION IN SUPPORT OF DEFENDANT-APPELLEE**

SUBMITTED BY:
JENNIFER L. SARVADI
HUDSON COOK, LLP
1909 K Street, NW, 4th Floor
Washington, DC 20006
(202) 715-2008
jsarvadi@hudco.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... ii

STATEMENT OF INTEREST OF AMICUS CURIAE ...........................................1

ARGUMENT ..................................................................................................3

    I.    Tenant Screening Plays an Important Role in Managing Risk and Ensuring Compliance with Applicable Law.............................................4

    II.   The Court Should Uphold the District Court's Ruling that CoreLogic Did Not "Otherwise Make Unavailable Or Deny Housing" By Providing A Consumer Report and Tool to Review the Same to the Housing Provider. ........................................................................8

    III.  The FCRA Does Not Obligate Consumer Reporting Agencies to Disclose Files Without a Complete Request. .....................................177

CONCLUSION ...........................................................................................21

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Cure v. Pedcor Mgmt. Corp., 265 F. Supp. 3d 984 (D. Neb. 2016)* .........................7

*Baker v. Midland Funding, LLC*, 692 F. App'x 956 (9th Cir. 2017) .......................19

*Bank of America Corp. v. City of Miami*, 581 U.S. 189 (2017) .................... 8, 9, 15

*Cure v. Pedcor Mgmt. Corp.*, 265 F. Supp. 3d 984 (D. Neb. 2016).........................7

*Frederick v. Cap. One Bank (USA), N.A.* 2015 WL 5521769 (S.D.N.Y. 2015) .....16

*Hicks v. Smith*, No. 3:17-CV-251-CHB, 2020 WL 5824031 (W.D. Ky. Sept. 30,

    2020) ........................................................................................................19

*Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992) ....................9

*HUD v. Rucker*, 535 U.S. 125 (2002) .......................................................5

*Kelly v. RealPage Inc.*, 47 F.4th 202 (3d Cir. 2022) ...............................................18

*Laufman v. Oakley Bldg. & Loan Co.,* 408 F. Supp. 489 (S.D. Ohio 1976)...........14

*McDiarmid v. Econ. Fire & Cas. Co.,* 604 F. Supp. 105 (S.D. Ohio 1984) ...........14

*Menton v. Experian Corp.*, No. 02 CIV. 4687 (NRB), 2003 WL 941388 (S.D.N.Y.

    Mar. 6, 2003)..........................................................................................19

*Ogbon v. Beneficial Credit Services, Inc.*, No. 10 CIV. 3760 PAE, 2013 WL

    1430467 (S.D.N.Y. Apr. 8, 2023)............................................... 4, 19, 20

*Samuel v. SageStream, LLC*, 2023 WL 4048695 (N.D. Ga. Apr. 28, 2023), *report*

    *and recommendation adopted*, 2023 WL 9291572 (N.D. Ga. July 12,

    2023) ............................................................................................. 18, 20

*Staub v. Proctor Hospital,* 562 U.S. 411 (2011) ................................. 10, 11, 12, 14

*United States v. Am. Inst. of Real Est. Appraisers of Nat. Ass'n of Realtors*, 442 F.

    Supp. 1072 (N.D. Ill. 1977) .................................................................14

**Statutes**

15 U.S.C. §§ 1691 ....................................................................................11

15 U.S.C. §§1681g ......................................................................... 4, 17, 20

15 U.S.C. §§1681h............................................................................. 4, 17

15 U.S.C. §1681m........................................................................................13

15 U.S.C.§§1681 *et seq.*..............................................................................2

42 U.S.C. § 3604 ........................................................................................8

42 U.S.C. §§ 3601 *et seq*...........................................................................2

42 U.S.C. §§ 3605 .............................................................................. 14, 15

**Other Authorities**

David Thacher, *The Rise of Criminal Background Screening in Rental Housing,* 33

    Law & Social Inquiry 5, Winter 2008 ..................................................6

Federal Trade Commission, *40 Years of Experience with the Fair Credit Reporting*

    *Act* (July 2011)............................................................................ 18, 19

Federal Trade Commission, *What Landlords Need to Know* ...................................7

HUD Handbook 4350.3: Occupancy Requirements of Subsidized Multifamily

    Housing Providers (Nov. 2013)................................................... 6, 7, 16

Restatement (Second) of Agency § 1 (1958)...........................................12

iii

Treasury Secretary John W. Snow Testimony on Strengthening Consumer Interests of the Fair Credit Reporting Act Before the Committee on Banking, Housing, and Urban Affairs ..................................................................................6

**Rules**

Federal Rule of Appellate Procedure 29 ....................................................1

**Regulations**

12 C.F.R. §1022.123 ...............................................................................17

12 C.F.R. Part 1002...............................................................................11

24 C.F.R. § 5.850 et seq..........................................................................5

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Amici Curiae Consumer Data Industry Association and the Professional Background Screeners Association are both nonprofit organizations. They have no parent corporations and no publicly held corporation owns a portion of either of them.

The Consumer Data Industry Association ("CDIA") and the Professional Background Screening Association ("PBSA") (together with CDIA, "*Amici*") respectfully submit this brief in support of Appellee CoreLogic Rental Property Solutions, LLC's ("CoreLogic") opposition to Appellants Connecticut Fair Housing Center ("CFHC") and Carmen Arroyo's ("Arroyo", with CFHC "Appellants") appeal of the decision of the district court, and in support of CoreLogic's cross-appeal of the same.

## STATEMENT OF INTEREST OF AMICUS CURIAE

CDIA[1] is a trade association representing consumer reporting agencies ("CRAs"), including the nationwide credit bureaus, regional and specialized credit bureaus, and background check and residential screening companies. Founded in 1906, CDIA promotes the responsible use of consumer data to help consumers achieve their financial goals and to help businesses, governments, and volunteer organizations avoid fraud and manage risk. Through data and analytics, CDIA members empower economic opportunity, thereby helping to ensure fair and safe

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(2), *Amici* represent that all parties have consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *Amici* represent that no party or party's counsel has authored this brief, in whole or in part, or contributed money intended to fund the preparation or submission of this brief. Further, no person other than *Amici* and their non-party members contributed money that was intended to fund the preparation or submission of this brief.

1

transactions for consumers and facilitating competition, expanding consumers' access to financial and other products suited to their unique needs.

PBSA is an international trade association of over 650 member companies that provide employment and tenant background screening and related services to virtually every industry around the globe. The tenant screening reports prepared by PBSA's background screening members are used by housing providers every day to ensure that residential communities are safe for all who work, reside, or visit there. PBSA members range from large background screening companies to individually-owned businesses, each of which must comply with applicable law, including when they obtain, handle, or use public record data.

*Amici*'s members provide tenant screening reports like the one at issue in this case; a form of consumer reports governed by the Fair Credit Reporting Act, 15 U.S.C. §§1681 *et seq.* ("FCRA"). The issues raised in this appeal addressing the applicability of the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.* ("FHA") to tenant screening companies, and the standards upon which all consumer reporting agencies may, or must, provide file disclosures, reach far beyond the parties in this case. *Amici* are therefore uniquely qualified to assist this Court in understanding the impact of the positions advocated by the parties and the implications of those on their industry.

## **ARGUMENT**

The United States economy depends upon the collection, sharing, and use of data, and the tenant screening industry is no exception. Housing providers use a variety of information and tools to evaluate the risk posed by potential applicants in order to make well-informed, objective decisions on whether to offer housing to an applicant. Housing providers owe a duty to existing residents, employees, and visitors to keep their properties safe.

Before this Court are two questions - one of which is whether tenant screening companies are subject to liability under the federal Fair Housing Act for "making housing unavailable" when they provide credit history, tenant performance, and other public record data to property managers and owners who make rental housing decisions. A thoughtful look into the tenant screening process demonstrates why the answer to that question is no. Tenant screeners provide data that housing providers use in combination with other data to evaluate applicants under their own internal policies and procedures and criteria. Consumer reporting agencies are not in the business of making housing decisions in response to consumer applications - they simply provide data and, sometimes, tools that aid the customer in using that data. The district court properly found that CoreLogic did not "make housing unavailable" and should not be liable under the FHA.

The second question is whether CoreLogic, as a consumer reporting agency, may be subject to liability under the FCRA for failing to disclose the contents of a consumer's file to a third party when the third-party requestor failed to provide valid evidence demonstrating their lawful authority over the consumer. Under the FCRA, consumer reporting agencies must provide file disclosures in response to a consumer's *complete* request - but only after authenticating the individual's identity, and in the case of third parties, that person's authority to act on the consumer's behalf. 15 U.S.C. §§1681g(a), 1681h. Failure to satisfy this condition precedent bars any claim under FCRA. *See Ogbon v. Beneficial Credit Services, Inc.*, No. 10 CIV. 3760 PAE, 2013 WL 1430467, at *10 (S.D.N.Y. Apr. 8, 2023). Given the undisputed fact that the requestor (Mrs. Arroyo) never satisfied the condition precedent, the district court erred in imposing liability under the FCRA.

## I. Tenant Screening Plays an Important Role in Managing Risk and Ensuring Compliance with Applicable Law.

The tenant screening consumer reports at issue in this case do not exist in a vacuum. Instead, they are one form of a consumer report, existing within a robust and diverse ecosystem comprised of consumer reporting agencies, consumers, and users of reports such as: property managers and landlords, creditors, employers, the government, law enforcement, investors, and insurers. Each participant has a unique role in the ecosystem, which roles are established and regulated under the FCRA and other applicable state and federal laws. Consumer reporting agencies provide

important information that their users rely on to make decisions affecting consumers daily.

Relevant to rental housing, tenant screening consumer reporting agencies provide objective tenant screening reports that are specifically designed to provide a more complete picture of the consumer to identify potential risks to persons and property while minimizing the risk of discrimination. Rental property managers have a responsibility not only to evaluate the applicant's ability to satisfy their financial lease obligations, but also to ensure the safety and wellbeing of their employees, residents, and guests. *See, e.g., HUD v. Rucker*, 535 U.S. 125, 134-35 (2002) (affirming the ability of public housing authorities to have no-fault evictions to protect health and safety interests); *see also* Preventing Crime in Federally Assisted Housing — Denying Admission and Terminating Tenancy for Criminal Activity or Alcohol Abuse, 24 C.F.R. § 5.850 et seq. (2013) (defining times when public housing authorities may or must terminate tenants involved in particular types of criminal activity). The responsible use of tenant screening advances all of these interests — economic stability, protection from identity theft, and general public safety.

Following meaningful progress in the availability of credit to minority and underserved communities that resulted from the expanded use of credit scores and

other credit reports, which were found to be race-neutral,[2] and given investments in technology and data collection, tenant screening has grown significantly in this country since the 1990's,[3] and *Amici* expect it to continue to grow in the future.

Recognizing the value that these tenant screening tools offer, the federal Department of Housing and Urban Development ("HUD") not only permits the screening of housing applicants based on consumer report information, including criminal history information, it explains how such information may be used in housing decisions.[4] HUD recommends that properties establish their own written

---

[2] Treasury Secretary John W. Snow Testimony on Strengthening Consumer Interests of the Fair Credit Reporting Act Before the Committee on Banking, Housing, and Urban Affairs, *available at* https://home.treasury.gov/news/press-releases/js620 (last visited Feb. 21, 2023).

[3] David Thacher, *The Rise of Criminal Background Screening in Rental Housing*, 33 Law & Social Inquiry 5, Winter 2008, p. 11.

[4] In its Handbook for subsidized multifamily housing providers, HUD addresses the screening procedures of housing providers, and specifically discusses the use of credit history, criminal history, and prior tenancy history as information that a housing provider would want to consider. *See* HUD Handbook section 4350.3: Occupancy Requirements of Subsidized Multifamily Housing Providers (Nov. 2013) *available at* https://www.hud.gov/sites/documents/43503HSGH.PDF (last visited 2/22/2024) (the "Handbook") at Chapter 4. With regard to criminal information, the Handbook provides: "Owners may establish additional standards that prohibit admission if the owner determines that any household member is currently engaging in, or has engaged in, the following activities during a reasonable time before the admission decision: a. Drug-related criminal activity. The owner may include additional standards beyond the required standards that prohibit admission in the case of eviction from federally assisted housing for drug related criminal activity and current drug use. b. Violent criminal activity. c. Other criminal activity that threatens the health, safety, and right to peaceful enjoyment of the property by other residents or the health and safety of the owner, employees,

approval criteria by which housing applications will be evaluated, and encourages providers to apply their criteria consistently across all applicants. Handbook § 4-7, p. 4-23. The FTC also recognizes that a housing provider may review an applicant's prior criminal history, and use that as a basis for approving or denying housing. Federal Trade Commission, *What Landlords Need to Know.* https://www.ftc.gov/business-guidance/resources/using-consumer-reports-what-landlords-need-know (last visited 02/22/2024). Thus, it is not surprising that housing providers each establish their own screening criteria and will not deviate from it, with the goal of *avoiding, not facilitating,* discrimination in housing.

Sadly, tragic consequences may result when criminal record information is not utilized. For example, in 2016, a Nebraska tenant's minor child was kidnapped and raped by another resident who had been allowed to move into a rental community without first undergoing a background check. *Cure v. Pedcor Mgmt. Corp.*, 265 F. Supp. 3d 984, 988–89 (D. Neb. 2016) (denying motion to dismiss because plaintiff alleged sufficient facts to argue that if the landlord had conducted a background check, it would have discovered that the perpetrator had multiple convictions for assault and public indecency). Overruling the district court and holding that the FHA applies to a tenant screening company's provision of criminal

---

contractors, subcontractors, or agents of the owner." Handbook § 4-7(C), pp. 4-19 - 20.

history information would impair the advancement of critical public policy objectives to the potential detriment of consumers and businesses alike.

II.     **The Court Should Uphold the District Court's Ruling that CoreLogic Did Not "Otherwise Make Unavailable Or Deny Housing" By Providing A Consumer Report and Tool to Review the Same to the Housing Provider.**

The key question in this case is whether a tenant screening company, such as CoreLogic, is subject to the FHA – that is, whether a tenant screening company denies housing or otherwise makes housing unavailable by providing consumer report information and related tools that assist customers in reviewing those reports. The answer to that question, as the district court correctly ruled, is no. Consumer reporting agencies do not "make housing unavailable" by providing data or allowing customers to filter such data, per the customer's own criteria, for the customer's use in the housing process.

The FHA makes it unlawful "to refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). To state a claim under section 3604(a), a plaintiff must prove that the defendant proximately caused the complained-of injury by engaging in one of the expressly prohibited acts. *Bank of America Corp. v. City of Miami*, 581 U.S. 189, 201 (2017). To satisfy the proximate

8

causation requirement under the FHA, there must be some "direct relation between the injury asserted and the injurious conduct alleged" – mere foreseeability is not sufficient. *Id.* at 202 (quoting *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992)).

### A. Housing Providers Make Housing Decisions.

Appellants concede that housing providers "have the ultimate control over their screening criteria and their own responsibility for making housing decisions in a nondiscriminatory manner." App. Br. p. 27. However, Appellants work hard to paint a picture that housing providers are not the <u>first</u> decision-maker in the process; instead, they simply <u>review</u> a housing decision that has already been made by the CRA. App. Br., pp. 37-38. Housing providers, they argue, rely on these "decisions" by consumer reporting agencies, which reliance is "eminently foreseeable;" and therefore, the consumer reporting agency is the proximate cause of any alleged harm. Such arguments are not supported by the facts developed at trial, or the general practices in the industry.

Consistent with other providers in the industry, CoreLogic prepares a consumer report which may include public records pertaining to a consumer. The company also offers a tool (called CrimSAFE), which allows the housing provider customer to customize how the reported information is communicated to it, including identifying particular records the housing providers would like to see

identified for further review. *See* Memorandum of Decision & Order dated July 20, 2023, (ECF 317) ("Op.") at 6.[5] Such tools assist housing providers with a review of the consumer report information, and allows housing providers to focus on the applications that they determine warrant an individual review or further assessment by staff under their own policies and procedures. This filtering tool comes with a customizable notification to the housing provider user that an action needs to be taken - in CoreLogic's case - that there are "records found." Op. pp 6, 8-10.

Appellants argue essentially that this tool transforms CoreLogic from a data provider to a decision-maker because it should be reasonably foreseeable that a housing provider will rely on CoreLogic's "decision" and not take further action. Respectfully, a consumer reporting agency has a right to assume that the user will not breach the terms of its contract and applicable law, and would properly review the housing applications, together with the consumer report information provided, in making its decision.

In support of their foreseeability argument, Appellants rely on *Staub v. Proctor Hospital*, an employment discrimination case. 562 U.S. 411 (2011). The problems with Appellants' arguments are two-fold. First, *Staub* is easily

---

[5] CoreLogic's brief in this case explains key elements of the CrimSAFE product in detail. *See* Page Proof Brief For Defendant-Appellee/Cross-Appellant CoreLogic Rental Property Solutions, LLC, Dkt. 67, pp. 8-10.

distinguishable from this case, and second, the landlord is not "independently reviewing" a leasing decision that has already been made - *the landlord is the only one making the decision.*

In *Staub*, the plaintiff claimed discrimination based on his military status, arguing that his biased supervisors made a series of allegedly false complaints against him, which resulted in his termination. *Id.* at 414-15. The Supreme Court found that the supervisors who filed the complaints proximately caused Staub's termination, even though there was an independent intervening review of the complaints, because their personal biases infected the entire process - motivating them to go so far as to lie to their supervisors. *Id.* at 419. The court explained "it is axiomatic under tort law that the exercise of judgment by the decisionmaker does not prevent the earlier agent's action (and hence the earlier agent's discriminatory animus) from being the proximate cause of harm." *Id*. The relationship among all parties involved - employer, supervisor, and employee - was a close-knit agency relationship where duties were owed among each of them to one another.

*Staub* is easily distinguished from the case at hand, first and foremost because a tenant screening company is not an agent of the housing provider, generally, and neither was CoreLogic an agent of WinnResidential, specifically. An agency relationship may be express or implied, but in any event is a "fiduciary relation which results from the manifestation of consent by one person to another that the

11

other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1 (1958). Here, the district court correctly found that CoreLogic was not an agent of the housing provider based on a plethora of evidence of the same, including but not limited to: the fact that the screening service agreement between CoreLogic and the housing provider expressly stated CoreLogic is not an agent of the housing provider and that the housing provider was obligated to follow the FHA; that CoreLogic provided CrimSAFE customers with training that reminded the customers they were solely responsible for complying with the FHA; that CoreLogic trained housing provider staff to consult the housing provider's own internal guidelines upon receipt of a CrimSAFE report prior to the provider making a housing decision; and, perhaps most importantly, *that CoreLogic had no power to direct a housing provider to accept or deny an applicant.* Op. at 4, 42, 44. Finding no evidence of express, or even implied agency, the argument that CoreLogic stands in even closer relation to the housing decision than an employer to a termination decision cannot stand.

As explained in detail above, *Staub* also is not persuasive here where CoreLogic's contract, product, and procedures were all aligned to make clear that only the housing provider could approve or decline an applicant. The nature of this relationship is entirely consistent with not only the spirit of the FCRA, but also its express provisions. Under the FCRA, where adverse action notice is required to be

provided, the notice must include *"a statement that the consumer reporting agency did not make the decision to take adverse action and is unable to provide the consumer the specific reasons why the adverse action was taken."* 15 U.S.C. §1681m(a)(3)(B). Thus, not only does the law recognize that the user of the report makes, and is responsible for, the decision taken in reliance on the consumer report, it requires that this fact be clearly disclosed to the consumer. Based on these facts, the district court properly found that CoreLogic was not within the scope of the FHA, and this Court should affirm.

> B.     *This Court Should Not Expand The FHA's Reach to Service Providers Whose Role Is Removed From the Housing Transaction.*

*Amici* Department of Justice ("DOJ") and HUD argue that tenant screening services are analogous to conduct by other non-housing providers, such as insurance companies and appraisers that have been deemed to effectively make housing unavailable. Brief for the United States as *Amicus Curiae*, Dkt. 49, p. 15. The early cases to have examined this issue found that the refusal to provide a product necessary to the real estate transaction to a consumer effectively makes housing unavailable:

> It is elementary that without insurance, mortgage financing will be unavailable, because a mortgage lender simply will not lend money on the property. Without mortgage financing, homes cannot be purchased. Thus, the availability of insurance and the ability to purchase a home go hand in hand and vary, in direct proportion, to one another.

13

*McDiarmid v. Econ. Fire & Cas. Co.,* 604 F. Supp. 105, 107 (S.D. Ohio 1984). *See also Laufman v. Oakley Bldg. & Loan Co.,* 408 F. Supp. 489, 493 (S.D. Ohio 1976) (finding "a denial of financial assistance in connection with a sale of a home would effectively" deny housing or make it unavailable); *United States v. Am. Inst. of Real Est. Appraisers of Nat. Ass'n of Realtors*, 442 F. Supp. 1072, 1079 (N.D. Ill. 1977) (holding that appraisers were subject to FHA).

It is worth noting that those early cases, like *McDiarmid*, were followed by amendments to the FHA in 1998, where Congress regulated certain third party providers of services related to the home-buying industry, further defining the scope of persons subject to the FHA's reach. FHA § 3605 prohibits discrimination in connection with "residential real estate transactions," which Congress defined to mean any of the following:

> (1) The *making or purchasing of loans or providing other financial assistance--*
>     *(A) for purchasing*, constructing, improving, repairing, or maintaining a dwelling; or
>     (B) secured by residential real estate.
>
> (2) The *selling, brokering, or appraising of* residential real property.

42 U.S.C. § 3605 (emphasis added). It is telling that Congress chose to expressly bring within the scope of FHA liability specific to third parties whose services are regularly offered directly to consumers that are necessary to facilitate the real estate transaction itself – in fact, it is part and parcel of the overall home-purchase process

– but did not include <u>all</u> third parties that provide services which may be used in a way that is related to, but not part of, such transactions. Lenders, insurers, and appraisers whose products and services are necessary to the completion of the transaction are within scope.[6] Notably *absent* from this list third parties like consumer reporting agencies, whose products are, and always have been, at least one step removed from the real estate transaction. A real estate transaction may still continue in the absence of a consumer report. A mortgage cannot proceed without insurance. This remoteness, or lack of "direct relation," takes them outside of the FHA. *Bank of America*, 581 U.S. at 202.

Similarly, a tenant screening company's connection to the ultimate housing decision is too remote for liability to attach. As the district court below aptly stated,

> CoreLogic does not have any power to intervene over its housing provider customers. It cannot direct a housing provider to accept an applicant; it is not even part of the discussion when a housing provider decides to accept an applicant. CoreLogic is not the agent or supervisor of their housing provider customers. CoreLogic has no say in whether housing providers accept or decline applicants, it merely provides the housing provider with publicly available information.

Op. at 44.

The district court's analysis in this case is aligned with at least one other case to address the question of whether the FHA applies to a consumer reporting agency.

---

[6] 42 U.S.C. § 3605.

*See Frederick v. Cap. One Bank (USA), N.A.* 2015 WL 5521769 (S.D.N.Y. 2015). In *Frederick*, the plaintiff alleged, among other claims, that a consumer reporting agency was liable under the FHA for making housing unavailable after one or more lenders used consumer report information (including a credit score) as a basis for denying plaintiff's application for a mortgage. *Id.* at *2. The court held that the business of credit reporting, which was well-regulated by other federal laws such as the FCRA, was outside the scope of the FHA. In so finding, the court considered the line of cases relied on by DOJ and HUD in support of Appellants' theories here, but concluded that "property insurance is intrinsically related to real estate transactions in a way that credit reporting practices are not." *Id.* Even while acknowledging that disputed credit information could lead to a person having a lower credit score, which could in turn affect the consumer's ability to obtain financing to purchase a home, the court explained that relationship between was "too far removed from the purchase or rental of housing to fall within the ambit of the FHA." *Id.*

Assuming that a housing provider is complying with applicable guidance from HUD on the use of criminal history information, an applicant with a criminal history is not categorically prevented from obtaining housing in the way that an individual who is unable to obtain property insurance is unable to obtain the requisite mortgage financing necessary to purchase a home. *See* Handbook § 4-7(C), p. 4-19-20. In fact, while *Amici* strongly believe that better data makes better decisions, if tenant

screening reports were no longer available to housing providers, the housing providers would simply rely on other sources of information to make their independent housing decisions.

### III. The FCRA Does Not Obligate Consumer Reporting Agencies to Disclose Files Without a Complete Request.

While the district court correctly analyzed the complex FHA liability claim, the court's analysis of the FCRA file disclosure claim missed the mark. Under federal law, a consumer reporting agency is required to disclose "[a]ll information in the consumer's file" upon request *from the consumer*. 15 U.S.C. §1681g. The release of the file is subject to section 1681h(a), which states that "[a] consumer reporting agency shall require, *as a condition of making the disclosures required under section 1681g of this title*, that the consumer furnish proper identification." 15 U.S.C. § 1681h(a) (emphasis added). While the statutory text of the FCRA is silent on the standard for identity verification, the FCRA's implementing regulation provides guidance on what constitutes "proper identification" for FCRA purposes, including the provision of file disclosures. *See* 12 C.F.R. § 1022.123. These requirements apply to all consumer reporting agencies. This "proper identification" requirement is directly related to the duty consumer reporting agencies owe to consumers to protect their privacy and keep information about them confidential.

Consumer report files contain highly sensitive information, and consumer reporting agencies must ensure that the files are not disclosed to unauthorized persons.

The consumer reporting agency's duty to disclose under § 1681g is an obligation owed to the consumer. *See Kelly v. RealPage Inc.*, 47 F.4th 202, 217 (3d Cir. 2022) ("The text of § 1681g confirms it relates to direct requests of consumers . . . Section 1681g thus outlines a process by which the consumer, and the consumer alone, can make a request and trigger the CRA's specified disclosure obligations."). Notwithstanding, regulators and courts alike have recognized that requests from certain third parties may be valid if, in addition to receipt of proper identification of the consumer about whom information is requested, the requesting party submits sufficient proof of their authority to act on behalf of that consumer. *Samuel v. SageStream, LLC*, 2023 WL 4048695, at *3-4 (N.D. Ga. Apr. 28, 2023), *report and recommendation adopted*, 2023 WL 9291572 (N.D. Ga. July 12, 2023); Federal Trade Commission, *40 Years of Experience with the Fair Credit Reporting Act*, pp. 70-71 (July 2011) (the "40 Years' Report").

The FTC's 40 Years' Report provides guidance regarding third-party requests for a file disclosure: "[a] CRA may disclose a consumer's file to a third party authorized by the consumer's written power of attorney to obtain the disclosure, *if the third party presents adequate information and fulfills other applicable conditions* of disclosure (e.g., pays a fee, if required)." 40 Years' Report, p. 70 (emphasis

added). Thus, the FTC recognizes that the duty to provide a file disclosure is conditioned on the third party "presenting adequate information and fulfilling other applicable conditions." *Id.*

Courts that have considered the issue have interpreted the "proper identification" requirement as a condition precedent to an obligation on the part of the consumer reporting agency owing a legal duty to provide the file disclosure. *See Ogbon v. Beneficial Credit Services, Inc.*, No. 10 CIV. 3760 PAE, 2013 WL 1430467, at *10 (S.D.N.Y. Apr. 8, 2023) ("[A] condition precedent to the consumer reporting agency's making such a disclosure is that 'the consumer furnish proper identification.'"); *see also Menton v. Experian Corp.*, No. 02 CIV. 4687 (NRB), 2003 WL 941388, at *2 (S.D.N.Y. March 6, 2003) ("The right of a consumer to obtain the full contents of his credit file 'on request' is qualified only by the requirement that the consumer furnish the credit reporting agency with 'proper identification'"). Absent satisfaction of the proper identification condition precedent, claims under the FCRA cannot survive. *See e.g.*, *Baker v. Midland Funding, LLC*, 692 F. App'x 956, 958 (9th Cir. 2017) (holding that district court properly granted summary judgment to consumer reporting agency on 15 U.S.C. § 1681j claim when consumer did not provide proper identification); *Hicks v. Smith*, No. 3:17-CV-251-CHB, 2020 WL 5824031 (W.D. Ky. Sept. 30, 2020) (holding that consumer reporting agency was not required to provide consumer with a copy of his

file under section 1681g where the consumer failed to prove that he submitted proper identification).[7]

At least one court has found that a consumer reporting agency should proceed with *more caution*, not less, when it receives multiple attempts by an individual to obtain a copy of a file on behalf of another person. *See Ogbon v. Beneficial Credit Services, Inc.*, No. 10 CIV. 3760 PAE, 2013 WL 1430467, at *9 (S.D.N.Y. April 8, 2023) (consumer reporting agency was "particularly justified" in proceeding with "an abundance of caution" to confirm consumer's identity after previous submissions contained discrepancies). Thus, the district court erred in finding any liability could attach to the facts presented, which is that Mrs. Arroyo did not ever provide a valid appointment, despite multiple requests for her to do so. The court below erred in finding a violation of the FCRA related to the file disclosure claim, and that finding should be reversed.

---

[7] After conducting a diligent search, no cases were identified that address claims under § 1681g arising from an alleged failure to provide a file disclosure to an individual who is under a conservatorship. Conservatorships are inherently creatures of state law, however, and what is required to demonstrate a valid appointment would vary by state. In this case, the conservatorship appointment stated on its face that it was only valid with a raised seal (and presumably, was presented before its expiration), which the Appellant Ms. Arroyo was never able to provide.

## **CONCLUSION**

For the foregoing reasons, *Amici* Consumer Data Industry Association and Professional Background Screening Association urge this Court to affirm the district court's ruling that tenant screening companies do not "otherwise make unavailable or deny housing" in providing consumer reports to housing providers, and reverse the district court on the FCRA claim on the basis that consumer reporting agencies cannot be held liable under the FCRA for an alleged failure to provide a file disclosure when the requestor fails to provide sufficient proof of identity and authority to act, and other relief as the Court deems just.

Dated: February 23, 2024          HUDSON COOK, LLP

*/s/ Jennifer L. Sarvadi*
Jennifer L. Sarvadi
1909 K Street, N.W., 4th Floor
Washington, D.C. 20006
(202) 715-2002
jsarvadi@hudco.com

*Counsel for Amici Curiae*
*Consumer Data Industry Association and*
*Professional Background Screening*
*Association*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

  x    in accordance with Local Rule 28.1.1(b) this brief contains 4947 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. R. App. P. 32(f), or

____  this brief uses a monospaced typeface and contains [state the number of] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

  x   this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font, or

____  this brief has been prepared in a monospaced spaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

        /s/ *Jennifer L. Sarvadi*
        Jennifer L. Sarvadi

22