# 23-1118(L)
## 23-1166(XAP)

_____

**In the United States Court of Appeals for the Second Circuit**
_____

Connecticut Fair Housing Center and Carmen Arroyo,
individually and as conservator of Mikhail Arroyo,
*Plaintiffs-Appellants-Cross-Appellees*

v.

CoreLogic Rental Property Solutions, LLC,
*Appellee-Cross-Appellant*

_____

**Appeal from the United States District Court for the District of Connecticut**
_____

**PAGE PROOF REPLY BRIEF OF PLAINTIFFS-APPELLANTS,
OPPOSITION BRIEF OF CROSS-APPELLEES**

**Oral Argument Requested**

Eric Dunn
**National Housing Law Project**
919 E. Main Street
Suite 610
Richmond, VA 23219
(415) 546-7000
edunn@nhlp.org

Christine Webber
**Cohen Milstein Sellers & Toll PLLC**
1100 New York Ave NW
Suite 500
Washington, D.C. 20005
(202) 408-4600
cwebber@cohenmilstein.com

Greg Kirschner
**Connecticut Fair Housing Center**
60 Popieluszko Ct.
Hartford, CT 06106
(860) 263-0724
greg@ctfairhousing.org

# TABLE OF CONTENTS

Page

Summary of Argument................................................................................1

Argument...................................................................................................3

I.  Race & National Origin Disparate Impact Claims ...........................3

    A.  Rental applicant background checks are not exempt from the Fair Housing Act. .................................................................3

        1.  The FHA does not exempt background screening.....................4

        2.  Background screeners can make unavailable or deny housing when they interpret and apply specific applicants' data to landlord admission criteria. .........................6

        3.  Background screeners are agents of client landlords...............10

        4.  CoreLogic speaks and acts through CrimSAFE. ......................11

    B.  The trial court improperly found CoreLogic did not make housing unavailable after applying inappropriate legal tests. .............14

        1.  The trial court did not consider whether adverse CrimSAFE reports made housing more difficult to obtain. .........................................................................15

        2.  The trial court improperly found that CoreLogic did not make housing unavailable.......................................................17

            a.  The "disqualified applicants" standard was erroneous.................................................................18

            b.  The "prevented individualized assessment" standard was erroneous.................................................20

    C.  The adverse CrimSAFE report proximately caused the denial of housing to Mr. Arroyo...........................................................23

        1.  The adverse CrimSAFE report directly caused the denial of Mr. Arroyo's application. .......................................24

        2.  CoreLogic participates directly in discriminatory decisions and has the ability to refrain from doing so, unlike the county defendant in *Mhany*......................................27

## TABLE OF CONTENTS

Page

3. CoreLogic is liable for its own conduct, whether viewed as making adverse reports when CrimSAFE is configured to deliver unjustifiably discriminatory results, or as permitting such configurations in the first place. .....................28

D. Evidence in the record supported claims of injury to Plaintiffs..........30

II. FCRA File Disclosure Issues..........................................................................31

A. Plaintiffs' FCRA claim is based on 15 U.S.C. § 1681n......................31

B. The trial court's denial of actual damages did not defeat Article III standing over the FCRA file disclosure claim. ..............................33

C. The trial court properly held CoreLogic liable for willfully violating 15 U.S.C. § 1681g and awarded statutory damages under 15 U.S.C. § 1681n. ......................................................................37

III. Disparate Impact Based on Disability ............................................................40

A. Plaintiffs were not required to show a denial of housing to succeed on their claim under 42 U.S.C. § 3604(f). .............................41

1. It is not necessary to show that discrimination produced housing denials, only that the challenged policy disadvantaged persons with disabilities in connection with housing-related services....................................................42

2. CoreLogic's policy produces an adverse impact on disabled persons' access to housing...........................................43

B. Plaintiffs' evidence of a categorically discriminatory policy was sufficient to show CoreLogic predictably discriminated against disabled individuals.............................................................................47

C. CoreLogic misstates Plaintiffs' proposed less discriminatory alternative. .........................................................................................52

IV. Reasonable Accommodation Claim ................................................................53

A. Mr. Arroyo's reasonable accommodation claim is not a claim for failure to engage in the interactive process. ..................................54

# TABLE OF CONTENTS

Page

B.     Plaintiffs showed that Mr. Arroyo was likely denied an equal opportunity to enjoy the housing of his choice. ...................................55

C.     Accepting a copy of the conservatorship certificate would also have been a reasonable accommodation. ............................................57

V.     Conclusion ........................................................................................59

# CASES

*Adams v. Nat'l Eng'g Serv. Corp.*,
620 F.Supp.2d 319 (D. Conn. 2009)..................................................44

*Atl. Specialty Ins. Co. v. Coastal Env't Grp. Inc.*,
945 F.3d 53 (2d Cir. 2019) .................................................................3

*Bank of Am. Corp. v. City of Miami*,
581 U.S. 189 (2017).....................................................................*passim*

*Cabrera v. Jakabovitz*,
24 F.3d 372 (2d Cir. 1994) ............................................................9, 11

*Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*,
685 F.3d 917 (10th Cir. 2012) ............................................................56

*Citibank, N.A. v. Brigade Cap. Mgmt., LP*,
49 F.4th 42 (2d Cir. 2022) .................................................................15

*Cleveland v. Caplaw Enters.*,
448 F.3d 518 (2d Cir. 2006) ................................................................7

*Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*,
478 F.Supp.3d 259 (D. Conn. 2020)....................................................32

*Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*,
No. 3:18-CV-705, 2023 WL 4669482 (D. Conn. July 20, 2023).........3

*Connecticut v. Teal*,
457 U.S. 440 (1982)............................................................................10

*Consumer Data Indus. Ass'n v. Frey*,
26 F.4th 1 (1st Cir. 2022), *cert. denied*, 143 S. Ct. 777 (2023)............5

*Corey v. U.S. Sec'y of Hous. & Urb. Dev. ex rel. Walker*,
719 F.3d 322 (4th Cir. 2013) ..............................................................16

*Cripe v. City of San Jose*,
261 F.3d 877 (9th Cir. 2001) ..............................................................48

*Danehy v. Experian Info. Sol., Inc.*,
No. 18-CV-17, 2018 WL 4623647 (E.D.N.C. Sept. 26, 2018) ..........58

iv

*Davis v. Money Source Inc.*,
 No. 21-cv-00047, 2021 WL 3861908 (D. Conn. Aug. 30, 2021) .....................43

*Dayton Veterans Residences Ltd. P'ship v. Dayton Metro. Hous. Auth.*,
 No. 22-3935, 2023 WL 8081677 (6th Cir. Nov. 21, 2023).................................56

*Fortune Soc'y v. Sandcastle Towers Hous. Dev. Fund Corp.*,
 388 F.Supp.3d 145 (E.D.N.Y. 2019) ..................................................................27

*Francis v. Kings Park Manor, Inc.*,
 992 F.3d 67 (2d Cir. 2021) .................................................................................29

*Frederick v. Cap. One Bank (USA), N.A.*,
 No. 14-cv-5460, 2015 WL 5521769 (S.D.N.Y. Sept. 17, 2015).....................5, 6

*Ga. State Conf. of the NAACP v. City of LaGrange*,
 940 F.3d 627 (11th Cir. 2019) ...........................................................................43

*Gilead Cmty. Servs., Inc. v. Town of Cromwell*,
 432 F.Supp.3d 46 (D. Conn. 2019).............................................................7, 15, 16

*Griffin v. Sirva Inc.*,
 835 F.3d 283 (2d Cir. 2016) ...............................................................................51

*Griggs v. Duke Power Co.*,
 401 U.S. 424 (1971)............................................................................................10

*Harty v. West Point Realty, Inc.*,
 28 F.4th 435 (2d Cir. 2022) ..........................................................................36, 37

*Havens Realty Corp. v. Coleman*,
 455 U.S. 363 (1982)............................................................................................31

*Higgins v. 120 Riverside Blvd. at Trump Place Condo.*,
 No. 21-cv-4203, 2021 WL 5450205 (S.D.N.Y. Nov. 19, 2021) .......................54

*Jeanty v. McKey & Poague, Inc.*,
 496 F.2d 1119 (7th Cir. 1974) .......................................................................7, 25

*Kelly v. RealPage Inc.*,
 47 F.4th 202 (3d Cir. 2022) ....................................................................34, 35, 36

v

*Laufer v. Looper*,
22 F.4th 871 (10th Cir. 2022) ...............................................................37

*LeBlanc-Sternberg v. Fletcher*,
67 F.3d 412 (2d Cir. 1995) ...............................................................4, 16

*Logan v. Matveevskii*,
57 F.Supp.3d 234 (S.D.N.Y. 2014) ....................................................56

*Louis v. SafeRent Sols., LLC*,
No. 22-CV-10800, 2023 WL 4766192 (D. Mass. July 26, 2023) ..........12, 13, 43

*Lowman v. Platinum Prop. Mgmt. Servs., Inc.*,
166 F.Supp.3d 1356 (N.D. Ga. 2016)............................................21, 26

*Menton v. Experian Corp.*,
No. 02 Civ. 4687, 2003 WL 941388 (S.D.N.Y. Mar. 6, 2003) ...................56, 57

*Mhany Mgmt., Inc. v. Nassau Cnty.*,
819 F.3d 581 (2d Cir. 2016) ......................................................4, 27, 42

*Middlebrooks v. Experian Info. Sols., Inc.*,
No. 20-CV-2279, 2020 WL 9600586 (N.D. Ga. Nov. 3, 2020)........................58

*Mitchell v. Shane*,
350 F.3d 39 (2d Cir. 2003) ...................................................................7

*R.B. Ventures, Ltd. v. Shane*,
112 F.3d 54 (2d Cir. 1997) .................................................................48

*Rodriguez v. Village Green Realty, Inc.*,
788 F.3d 31 (2d Cir. 2015) .................................................................15

*Sassower v. Field*,
752 F.Supp. 1182 (S.D.N.Y. 1990) ...............................................7, 8, 24

*Short v. Manhattan Apts., Inc.*,
916 F.Supp.2d 375 (S.D.N.Y. 2012) .............................................*passim*

*Soules v. U.S. Dep't of Hous. & Urb. Dev.*,
967 F.2d 817 (2d Cir. 1992) ...............................................................20

*Staub v. Proctor Hosp.*,
562 U.S. 411 (2011)................................................................19, 20, 25

*Sulkowska v. City of N.Y.*,
129 F.Supp.2d 274 (S.D.N.Y. 2001) ....................................................58

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project Inc.*,
576 U.S. 519 (2015)..........................................................................9, 20, 52

*Thurmond v. Bowman*,
211 F.Supp.3d 554 (W.D.N.Y. 2016)...........................................*passim*

*Trafficante v. Metro Life Ins. Co.*,
409 U.S. 205 (1972)................................................................................9

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021).......................................................................*passim*

*Tsombanidis v. W. Haven Fire Dep't*,
352 F.3d 565 (2d Cir. 2003) ................................................42, 47, 55

*United States v. Abu-Jihaad*,
630 F.3d 102 (2d Cir. 2010) ..............................................................45

*United States v. Hylton*,
944 F.Supp.2d 176 (D. Conn. 2013), *aff'd*, 590 F. App'x 13 (2d Cir.
2014) .........................................................................................................7

*United States v. Space Hunters, Inc.*,
429 F.3d 416 (2d Cir. 2005) ................................................................4

*United States v. Yonkers Bd. of Educ.*,
624 F.Supp. 1276 (S.D.N.Y.1985), *aff'd*, 837 F.2d 1181 (2d Cir. 1987)
..........................................................................................................4, 20

*Uzuegbunam v. Preczewski*,
592 U.S. 279, 141 S. Ct. 792 (2021)..................................................33

*Vasquez v. Empress Ambulance Serv., Inc.*,
835 F.3d 267 (2d Cir. 2016) ..............................................................19

*Wai v. Allstate Ins. Co.*,
75 F.Supp.2d 1 (D.D.C. 1999)...........................................................43

*Wheatley Heights Neighborhood Coal. v. Jenna Resales Co.*,
    429 F.Supp. 486 (E.D.N.Y. 1977) ......................................................15

*Woods v. Dunlop Tire Corp.*,
    972 F.2d 36 (2d Cir. 1992) ..........................................................38

*Zabriskie v. Fed. Nat'l Mortg. Ass'n*,
    912 F.3d 1192 (9th Cir. 2019), *amended and superseded on denial of*
    *rehearing en banc* 940 F.3d 1022 (2019) ..............................13, 14

STATUTES

15 U.S.C. § 1681a(d) .........................................................................13

15 U.S.C. § 1681c(a)(2) .......................................................................5

15 U.S.C. § 1681g ................................................31, 32, 33, 38, 57

15 U.S.C. § 1681h .............................................................32, 57

15 U.S.C. § 1681n .........................................................................*passim*

42 U.S.C. § 3604(a) ...............................................1, 4, 15, 16

42 U.S.C. § 3604(b) ...........................................................43

42 U.S.C. § 3604(f) ...............................................41, 42, 43, 55

OTHER AUTHORITIES

12 C.F.R. § 1022.137 ..........................................................38, 39

24 C.F.R. § 100.7 ..............................................11, 28, 29, 30

24 C.F.R. § 100.500 ...........................................20, 23, 48, 52

Fed. R. Evid. 401 ...............................................................45

Restatement (Second) of Agency § 1 cmt. b (1958) .......................11

Quid Pro Quo and Hostile Environment Harassment and Liability for
    Discriminatory Housing Practices Under the Fair Housing Act, 81 Fed.
    Reg. 63054, 63066-63067 (Sept. 14, 2016).......................................28

The Fair Credit Reporting Act's Limited Preemption of State Laws, 87 Fed. Reg. 41042, 41044 (July 11, 2022) ....................................................................... 5

U.S. Dept. of Hous. & Urb. Dev., Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions at 5-7 (Apr. 4, 2016), https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHASTAN DCR.PDF ............................................................................................................. 27

## SUMMARY OF ARGUMENT

First, this Court should reverse the district court's ruling that adverse CrimSAFE reports do not "otherwise make unavailable or deny" housing within the meaning of 42 U.S.C. § 3604(a) and remand for a determination of whether such reports did so in a manner that had an unjustifiable discriminatory effect on Black and Latino renters.

The facts established by the district court below showed that adverse CrimSAFE reports burden affected applicants and make housing more difficult to obtain. The facts also showed that an adverse CrimSAFE report caused the denial of housing to Mikhail Arroyo. Yet the district court found otherwise because it evaluated these questions under incorrect legal standards; it failed to consider whether CoreLogic made housing more difficult to obtain, and imposed additional requirements on Plaintiffs not rooted in the FHA. CoreLogic's facile assertion that the district court applied the correct legal standards does not hold up to scrutiny.

This Court should also reject CoreLogic's standing argument, which CoreLogic waived at trial, and which requires resolution of facts the trial court never adjudicated, though facts demonstrating Plaintiffs' standing are supported in the record. And this Court should decline the invitation from CoreLogic, joined with Amicus Consumer Data Industry Association, to simply rule the Fair Housing Act entirely inapplicable to residential tenant screeners.

1

Second, this Court should affirm the district court's conclusion that CoreLogic willfully violated the Fair Credit Reporting Act, and its award of damages under 15 U.S.C. § 1681n. Despite not recovering actual damages, Mr. Arroyo suffered a cognizable informational injury when CoreLogic withheld his consumer file from Carmen Arroyo without telling her what she needed to do to obtain it. That injury also had downstream negative effects on her ability to handle her son's legal affairs and advocate for his admission to WinnResidential housing. The claim rested on solid statutory footing and CoreLogic had full notice of the claim.

Third, this Court should reverse and reinstate the disability disparate impact and reasonable accommodation claims. Though it found on summary judgment that CoreLogic did not require conservators to present powers of attorney to obtain file disclosures on behalf others, the trial court found after the bench trial that CoreLogic did adhere to such a policy. The policy had the effect of denying every conserved person in Connecticut access to their CoreLogic file, including Mr. Arroyo. Making file disclosures to conservators would have been a less-discriminatory alternative and a reasonable accommodation.

CoreLogic confuses the issues in arguing that making file disclosures to conservators would have violated a legal requirement for visible seals on copies of conservatorship documents. Even if visible seals were necessary for identification

2

purposes, CoreLogic's policy was to require a power of attorney—not to accept a conservatorship certificate provided it had a visible seal. And CoreLogic's arguments that its failure to make file disclosures available to conservators caused no harm is equally specious; by denying access to their consumer files, CoreLogic deterred and disadvantaged conserved persons in their ability to pursue housing from CoreLogic's client landlords.

## ARGUMENT

## I.    RACE & NATIONAL ORIGIN DISPARATE IMPACT CLAIMS

The trial court's conclusion that adverse CrimSAFE reports did not "otherwise make unavailable, or deny" housing, and consequent dismissal of Plaintiffs' disparate impact race and national origin discrimination claims,[1] was contrary to the facts found at trial. This Court should reverse that ruling and remand for determination of whether such reports made housing unavailable in a racially or ethnically discriminatory manner.[2]

### A.    Rental applicant background checks are not exempt from the Fair Housing Act.

CoreLogic and Amicus Consumer Data Industry Association ("CDIA")

---

[1] Dkt. No. 317, Mem. of Decision and Order (hereafter "MDO") p. 37, reported as *Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, No. 3:18-CV-705, 2023 WL 4669482 (D. Conn. July 20, 2023).

[2] *See Atl. Specialty Ins. Co. v. Coastal Env't Grp. Inc.*, 945 F.3d 53, 63 (2d Cir. 2019) ("On appeal from a bench trial, conclusions of law — as well as mixed questions of law and fact — are reviewed de novo").

argue broadly that background screening simply cannot violate the Fair Housing Act ("FHA"). This Court should reject those arguments.

        1.    <u>The FHA does not exempt background screening.</u>

The FHA applies to substantially any conduct which, among other things, makes unavailable or denies housing.[3] Coverage is limited only by the directness and proximity of the conduct to diminished housing opportunity—not by the nature of the conduct.[4] Congress has not exempted background screeners; that the FHA does not specifically mention them is of no moment.[5]

CoreLogic's contention that reporting criminal records cannot violate the FHA because such activity is supposedly authorized by the Fair Credit Reporting Act ("FCRA") is also without merit. The FCRA provision CoreLogic cites for that contention merely restricts reporting information, including some criminal records,

---

[3] *See* 42 U.S.C. § 3604(a); *see Mhany Mgmt., Inc. v. Nassau Cnty.*, 819 F.3d 581, 600 (2d Cir. 2016) ("The phrase 'otherwise make unavailable' has been interpreted to reach a wide variety of discriminatory housing practices") (quoting *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 424 (2d Cir. 1995)); *see also Thurmond v. Bowman*, 211 F.Supp.3d 554, 564 (W.D.N.Y. 2016) ("That provision 'has been construed to reach every practice which has the effect of making housing more difficult to obtain on prohibited grounds.'") (quoting *United States v. Yonkers Bd. of Educ.*, 624 F.Supp. 1276, 1291 n.9 (S.D.N.Y.1985), *aff'd*, 837 F.2d 1181 (2d Cir. 1987)).

[4] See *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 202-03 (2017).

[5] *See United States v. Space Hunters, Inc.*, 429 F.3d 416, 424 (2d Cir. 2005) (Fair Housing Act "does not provide any specific exemptions or designate the persons covered, but rather . . . applies on its face to anyone" who engages in prohibited conduct).

4

that have become obsolete for consumer transactions.[6] Nothing in FCRA explicitly authorizes or requires the reporting of criminal history information, or exempts such reporting from restrictions imposed by the FHA or other laws.[7]

Amicus CDIA cites *Frederick v. Capital One Bank* for the proposition that "the business of credit reporting, which was well-regulated by other federal laws such as the FCRA, [is] outside the scope of the FHA."[8] But *Frederick* held only that the "credit reporting practices *as alleged in the complaint* [were] not subject to the FHA," not that credit-reporting can *never* give rise to an FHA claim.[9]

*Frederick* was a 36-count, pro se complaint against thirteen defendants who allegedly threatened to report false information to credit reporting agencies unless

---

[6] *See* 15 U.S.C. § 1681c(a)(2); *see also* Br. for Def.-Appellee/Cross-Appellant (hereafter "CoreLogic Br.") 41 n.13.

[7] *See Consumer Data Indus. Ass'n v. Frey*, 26 F.4th 1, 11 (1st Cir. 2022), *cert. denied*, 143 S. Ct. 777 (2023) (15 U.S.C. § 1681c(a) does not preempt state law restrictions on reporting certain information for reasons other than obsolescence); *see* The Fair Credit Reporting Act's Limited Preemption of State Laws, 87 Fed. Reg. 41042, 41044 (July 11, 2022) ("[A]lthough *how long* the specific types of information listed in section 1681c may continue to appear on a consumer report is a subject matter regulated under section 1681c, what or when items generally may be *initially* included on a consumer report is not a subject matter regulated under section 1681c.") (emphasis added).

[8] *See* Br. of Amici Curiae by CDIA (hereafter "CDIA Br.") 16 (citing *Frederick v. Cap. One Bank (USA), N.A.*, No. 14-cv-5460, 2015 WL 5521769, at *2 (S.D.N.Y. Sept. 17, 2015)).

[9] *See Frederick*, 2015 WL 5521769, at *3 (emphasis added).

5

the plaintiff paid certain invalid debts.[10] Though the false reports could have damaged his credit score, the court did not agree this alone made housing unavailable for FHA purposes.[11] Such a finding, the court observed, "would make credit reporting disputes potential FHA violations regardless of the subject matter of the underlying transaction."[12] Threating to damage the plaintiff's credit score by reporting false debts was thus too many steps removed from a housing transaction; *Frederick* does not preclude liability for discriminatory practices in preparing tenant-screening reports, which relate directly to housing admission decisions.[13]

> 2.  <u>Background screeners can make unavailable or deny housing when they interpret and apply specific applicants' data to landlord admission criteria.</u>

CoreLogic and CDIA further maintain, also on a categorical basis, that tenant screeners cannot make unavailable or deny housing because only landlords make "decisions" on rental applicants. FHA coverage does not depend on who the "decisionmaker" is, however, only on whether the actor participated sufficiently in carrying out an act of discrimination.[14]

---

[10] *See id.* at *1.

[11] *Id.* at *2.

[12] *Id.*

[13] *See generally Bank of Am. Corp.*, 581 U.S. at 203 (proximate cause under FHA requires direct relation between the conduct and injury asserted, usually within the "first step" of directness).

[14] *See, e.g.*, *Short v. Manhattan Apts., Inc.*, 916 F.Supp.2d 375, 399 (S.D.N.Y. 2012); *Thurmond*, 211 F.Supp.3d at 564; *Gilead Cmty. Servs., Inc. v.*

It is well-settled that employees and third party agents who screen rental applicants for landlords can bear liability for their own actions in administering discriminatory admission policies.[15] While courts in the Second Circuit have not extended such liability to actors who performed mere "ministerial tasks," such as notifying applicants of adverse rental decisions made entirely by others,[16] those who take substantial steps "cannot escape liability merely because those actions were taken at the behest of the landlords."[17]

Making a traditional background report, which merely locates and retrieves applicant data for a landlord's use in reaching a housing decision fully on its own, may amount only to a ministerial task.[18] But CrimSAFE does much more: it

---

*Town of Cromwell*, 432 F.Supp.3d 46, 71-72 (D. Conn. 2019).

[15] *See, e.g.*, *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 523 (2d Cir. 2006) (employee can be held liable under FHA for his own discriminatory acts) (discussing *Mitchell v. Shane*, 350 F.3d 39, 49 (2d Cir. 2003)); *United States v. Hylton*, 944 F.Supp.2d 176, 190 (D. Conn. 2013), *aff'd*, 590 F. App'x 13 (2d Cir. 2014) (agent liable for his own discriminatory actions and principals vicariously liable); *see also Short*, 916 F.Supp.2d at 399 ("It is well established that agents will be liable for their own unlawful conduct, even where their actions were at the behest of the principal.") (quoting *Jeanty v. McKey & Poague, Inc.*, 496 F.2d 1119, 1120–21 (7th Cir. 1974)).

[16] *See Sassower v. Field*, 752 F.Supp. 1182, 1187 (S.D.N.Y. 1990) (imposing liability on person who "in no way contributed to the board's decision to deny the application and had no authority to influence the board in any manner . . . [would be] a classic example of shooting the messenger for bringing bad news").

[17] *Short*, 916 F.Supp.2d at 400.

[18] *See Sassower*, 752 F.Supp. at 1187; *see Short*, 916 F.Supp.2d at 399-400.

7

constrains a client landlord's screening policy by requiring CoreLogic's chosen categories of crime and levels of severity be used, then applies the resulting screening policy to the contents of an applicant's criminal record and reports whether that applicant meets that landlord's admission criteria.[19] Preparing the report requires CoreLogic not only to find criminal records that match an applicant's personal identifiers, but to interpret the contents of those records.[20]  The result reflects CoreLogic's own judgments about whether specific criminal records are disqualifying under the admission parameters a landlord has selected.[21] Making this kind of report, which effectively replaces the landlord's traditional role of evaluating applicant data and applying admission criteria itself,[22] amounts to substantial assistance in carrying out an admission policy.[23] If that policy is discriminatory, then CoreLogic may be held liable for its own actions.[24]

Indeed, CoreLogic backhandedly concedes its role in admission decisions by

---

[19] MDO ¶¶ 7, 8, 10, 13, 16-17, 21, 28-30; *see Short*, 916 F.Supp.2d at 401.

[20] MDO ¶¶ 8, 21, 29, 32; *see also* Trial Tr. Nov. 3, 2022 pp. 91-93, 179; Dkt. No. 178-3, Joint Trial Mem., Attach. B (deposition designations of Yvonne Rosario).

[21] See MDO ¶¶ 20-21, 29.

[22] *See* MDO ¶ 17 ("CoreLogic described CrimSAFE as … a robust tool that relieves your staff from the burden of interpreting criminal search results [using] our own advanced, proprietary technology.").

[23] *See, e.g.*, *Short*, 916 F.Supp.2d at 400.

[24] *See id.*

8

repeatedly reframing CrimSAFE as designed to facilitate the acceptance, rather than denial, of applicants.[25] The trial court seemed to find this significant,[26] but there is no meaningful distinction between "filtering in" desirable applicants or "filtering out" unwanted ones. CrimSAFE actively sorts those who meet the landlord's admission criteria from those who do not, and the applicants in the latter group face a more difficult path to admission.[27] For the FHA to reach this kind of background report, and assure it does not sort qualified applicants from unqualified applicants on an unjustifiably discriminatory basis, is perfectly consistent with the Act's broad remedial purpose.[28]

For the FHA to reach screening reports that sort qualified from non-qualified applicants is also consistent with principles of proximate cause because adverse

---

[25] *See* CoreLogic Br. 1, 32.

[26] *See* MDO ¶¶ 11-12.

[27] *See* MDO ¶ 12 (CrimSAFE causes "automatic acceptances" for those with favorable results).

[28] *See Trafficante v. Metro Life Ins. Co.*, 409 U.S. 205, 209, 211-212 (1972) (FHA is "broad and inclusive" and implements a "policy that Congress considered to be of the highest priority" which can be given effect "only by a generous construction"); *see Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project Inc.*, 576 U.S. 519, 539 (2015) (suits targeting "housing restrictions that function unfairly to exclude minorities" without sufficient justification "reside at the heartland of disparate-impact liability"); *see also Cabrera v. Jakabovitz*, 24 F.3d 372, 388 (2d Cir. 1994) ("42 U.S.C. § 3604 [is] to be given broad and liberal construction, in keeping with Congress' intent in passing the Fair Housing Act of replacing racially segregated housing with 'truly integrated and balanced living patterns.'").

9

reports directly burden affected applicants and reduce their likelihood of admission.[29] CDIA and CoreLogic maintain that an adverse background report cannot proximately cause a denial of housing because a landlord can always admit an applicant anyway. This does not matter; an adverse screening report directly creates "discriminatory headwinds" that make housing more difficult to obtain notwithstanding any subsequent review or reconsideration.[30]

3.    Background screeners are agents of client landlords.

CDIA also argues broadly that tenant-screening companies are not agents of their client landlords—indeed, the trial court found CoreLogic was not the agent of WinnResidential in this case.[31] This contention is simply incorrect as a matter of basic agency law. As CoreLogic did here, a landlord and a background screener establish an agency relationship when they agree the screener will investigate rental applicants and report information about those applicants to the landlord—particularly when the landlord decides what admission criteria the screener will use to evaluate the applicant and which specific employees will receive the results.[32]

---

[29] *See Bank of America*, 581 U.S. at 203.

[30] *See Connecticut v. Teal*, 457 U.S. 440, 448 (1982) (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971)).

[31] *See* CDIA Br. 11-12; *see* MDO p. 44.

[32] *See Cabrera*, 24 F.3d at 387 ("[W]hether an agency relationship exists 'depends on the existence of required factual elements: the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the

10

Agency, being generally relevant to the principal's liability for acts of the agent, is of minimal relevance to this action, which seeks only to hold an agent liable for its own conduct.[33] But the erroneous view that background screeners are not agents of their client landlords should in no way affect the outcome.

### 4. CoreLogic speaks and acts through CrimSAFE.

CoreLogic attempts to disclaim responsibility for the contents of its reports, characterizing CrimSAFE as no more than a passive tool that enables *landlords* (i.e., not CoreLogic) to filter out criminal records they consider irrelevant.[34] But landlords who use CrimSAFE do not filter the criminal records themselves. Rather, landlords choose the lookback periods they wish to screen for in each category of crime and severity level provided by CoreLogic; CoreLogic filters the records by interpreting the contents, classifying them by crime type and severity, and deciding their age.[35] Through this process, CoreLogic, not the client landlord, determines whether an applicant meets the specified screening parameters. CoreLogic thus performs the task an employee of a property management company would traditionally do upon receipt of an applicant's background check (and explicitly

---

undertaking.'") (quoting Restatement (Second) of Agency § 1 cmt. b (1958)).

[33] *See* 24 C.F.R. § 100.7(a)(1).

[34] *See* CoreLogic Br. 8, 36.

[35] MDO ¶¶ 7-8, 10, 13, 15-17, 21, 29.

11

advertises itself as replacing this function).[36]

CoreLogic minimizes the significance of classifying criminal records, calling it a function equally performed by "any software system that responds to a query submitted by its user."[37] This is not accurate; CoreLogic's own CrimCHECK product, for one example, returns criminal records that match applicant personal identifiers submitted by query but does not categorize records.[38] CrimSAFE does not merely replace a manual process carried out by landlords with an automated one; the crime classifications in CrimSAFE reflect judgments made by CoreLogic's Enterprise Data Team,[39] and hence a landlord could not replicate CrimSAFE results by manually classifying crimes on its own.

In this way, CrimSAFE has much in common with the credit screening product at issue in *Louis v. SafeRent Solutions, LLC*, which "deliver[ed] 'an accept/decline/conditional decision' based on the housing provider's 'predetermined decision points'" but did not inform the landlord how the results were ultimately calculated.[40] The *Louis* court found such reports were capable of

---

[36] MDO ¶ 13 (quoting CoreLogic's advertising that CrimSAFE "frees your staff from interpreting criminal records").

[37] CoreLogic Br. 36.

[38] MDO ¶ 9.

[39] *See* Trial Tr. Nov. 3, 2022 pp. 91-93, 179.

[40] *Louis v. SafeRent Sols., LLC*, No. 22-CV-10800, 2023 WL 4766192, at *9 (D. Mass. July 26, 2023).

making housing unavailable.[41]

CoreLogic also urges this Court to follow an abrogated portion of a Ninth Circuit opinion, *Zabriskie v. Fannie Mae*, which found that Fannie Mae had not made "consumer reports"[42] through a web-based software program, Desktop Underwriter (DU), that lenders used to find out whether a borrower's loan would qualify for purchase by Fannie Mae.[43] The 2-1 majority ruled initially that DU did not make consumer reports because the DU software was a mere "tool" its users (i.e., lenders) used for assembling and evaluating the consumer data themselves.[44] But *Zabriskie* was not a fair housing case, and whether Fannie Mae made "consumer reports" via DU has no clear bearing on whether CoreLogic made housing unavailable by issuing adverse CrimSAFE reports.[45] To the extent it does, the *Zabriskie* majority itself later abandoned its view that DU was a mere tool of lenders and that Fannie Mae did not speak through the program.[46]

Specifically, a dissent in *Zabriskie* rejected the "tool" analogy and pointed

---

[41] *Id*. at *9.

[42] Establishing a "consumer report" subjects a communication to FCRA. *See* 15 U.S.C. § 1681a(d).

[43] *See* CoreLogic Br. 36; *see Zabriskie v. Fed. Nat'l Mortg. Ass'n*, 912 F.3d 1192, 1197 (9th Cir. 2019), *amended and superseded on denial of rehearing en banc* 940 F.3d 1022 (2019).

[44] *See id.* at 1198.

[45] *See id.*

[46] *See Zabriskie*, 940 F.3d at 1027.

13

out that Fannie Mae charged a subscription fee and per-report fees, that lenders accessed DU through a Fannie Mae web portal, and that DU assembled and processed the data on Fannie Mae's network:

> [I]t would be as if Fannie Mae allowed licensees to purchase access to measurements obtained with the tool, but did the measuring itself. The subscriber would identify the gap it wanted measured, and Fannie Mae would point the laser, record the findings, and provide a report….[47]

Ten months later, the *Zabriskie* court amended and reissued its opinion, abrogating the portion which held that Fannie Mae did not assemble or evaluate consumer information through DU.[48]

CrimSAFE does resemble DU in that landlords essentially identify "gaps for measurement" by choosing categories of crimes, severity levels, and lookback periods they wish to screen for—while CoreLogic "operates the tool" by interpreting and categorizing applicants' criminal records and applying landlords' admission criteria to determine who qualifies and who does not. These actions substantially assist landlords in carrying out their rental admission policies.[49]

### B. The trial court improperly found CoreLogic did not make housing unavailable after applying inappropriate legal tests.

The trial court improperly concluded that adverse CrimSAFE reports do not

---

[47] *Zabriskie*, 912 F.3d at 1204-05 (Lasnik, J., dissenting).

[48] *See Zabriskie*, 940 F.3d at 1027.

[49] *See Short*, 916 F.Supp.2d at 400.

14

otherwise make unavailable or deny housing (for FHA purposes) despite finding facts showing that such reports made housing more difficult for affected applicants to obtain. As Plaintiffs challenge only the trial court's conclusions of law, not its factual findings, de novo review is appropriate.[50]

> 1. <u>The trial court did not consider whether adverse CrimSAFE reports made housing more difficult to obtain.</u>

Conduct can "otherwise make unavailable" housing under the FHA by causing housing to be more difficult to obtain.[51] This includes imposing burdens on particular applicants or "conveying a sense that [they] are unwanted."[52] This standard lies at the heartland of well-settled fair housing law, under which discrimination may be carried out through steering applicants away from certain housing opportunities,[53] communicating a desire not to rent to them,[54] subjecting them to more rigorous application processes,[55] or various other means of deterring

---

[50] *See Citibank, N.A. v. Brigade Cap. Mgmt., LP*, 49 F.4th 42, 58 (2d Cir. 2022) (district court's conclusions of law following a bench trial are reviewed de novo).

[51] *See* 42 U.S.C. § 3604(a); *see also, e.g.*, *Thurmond*, 211 F.Supp.3d at 564.

[52] *Gilead*, 432 F.Supp.3d at 72.

[53] *See, e.g.*, *Wheatley Heights Neighborhood Coal. v. Jenna Resales Co.*, 429 F.Supp. 486, 488 (E.D.N.Y. 1977).

[54] *See, e.g.*, *Rodriguez v. Village Green Realty, Inc.*, 788 F.3d 31, 52-53 (2d Cir. 2015).

[55] *See Gilead*, 432 F.Supp.3d at 72 (discussing *Corey v. U.S. Sec'y of Hous. & Urb. Dev. ex rel. Walker*, 719 F.3d 322, 327 (4th Cir. 2013)).

and discouraging protected class members without excluding them altogether.[56] However, the trial court did not analyze whether adverse CrimSAFE reports caused housing to be more difficult to obtain.

CoreLogic offers no argument that making housing more difficult to obtain is insufficient to meet the "otherwise make unavailable, or deny" housing clause of 42 U.S.C. § 3604(a). Rather, CoreLogic suggests the trial court did apply that standard and that Plaintiffs simply failed to prove sufficient facts.[57] Yet nowhere in its ruling did the trial court discuss whether adverse CrimSAFE reports make housing more difficult to obtain, such as by marking applicants as unwanted or subjecting them to a more burdensome admission process.[58]

Furthermore, the trial court found ample facts showing that adverse CrimSAFE reports did cause housing to be more difficult to obtain. An adverse CrimSAFE report informs the landlord's leasing staff that an applicant has a criminal record which CoreLogic has adjudged to be disqualifying under the relevant admission criteria.[59] Communicating to a landlord that an applicant does

---

[56] *See, e.g.*, *LeBlanc-Sternberg,* 67 F.3d at 424 (ordinance that discouraged orthodox Jews from living in community by prohibiting home places of worship amenable to Fair Housing Act challenge).

[57] *See* CoreLogic Br. 30.

[58] *See* MDO pp. 37-46.

[59] MDO ¶¶ 22-23, 25.

16

not meet its admission policy certainly conveys a sense that applicant is unwanted.

An adverse CrimSAFE report also burdens the applicant by preventing an "automatic acceptance."[60] Only if the landlord takes further steps to review and reconsider the application might the applicant still be admitted.[61] That CrimSAFE enables landlords to suppress the applicant's criminal history details (such as the offense, disposition, or related dates) from their leasing staff further burdens applicants, as those staff members cannot independently reconsider or override a CrimSAFE result, or even tell applicants why they are rejected.[62]

It is true, as CoreLogic points out, that the trial court acknowledged that making housing more difficult to obtain was a cognizable way of triggering FHA coverage under the "otherwise make unavailable" provision.[63] But the trial court simply did not apply this standard in conducting its analysis or arriving at its legal conclusions.

2. <u>The trial court improperly found that CoreLogic did not make housing unavailable.</u>

Instead of evaluating whether adverse CrimSAFE reports made housing more difficult to obtain, the trial court set up its analysis as requiring proof either

---

[60] MDO ¶ 12.

[61] MDO ¶¶ 12, 33-34.

[62] MDO ¶¶ 25-26, 31-32, 48-49.

[63] MDO p. 34.

that CoreLogic "disqualified applicants," or that CoreLogic "prevented housing providers from conducting an individualized assessment of relevant mitigation information[.]"[64] To prevail under the "disqualified applicants" prong would have required proving that CoreLogic, rather than client landlords, decided what criteria to apply or whether to ultimately accept or reject applicants.[65] The second prong demanded proof that CoreLogic denied access to criminal record details to *entire landlord companies*.[66] These legal standards were improper and called for facts different in kind than the correct legal standard, which requires proving only that adverse CrimSAFE reports made housing more difficult to obtain.

a. *The "disqualified applicants" standard was erroneous.*

That CoreLogic neither set the admission criteria for landlords nor made the final decisions on applicants does not mean adverse CrimSAFE reports did not burden affected applicants. Hence the trial court's conclusion that CoreLogic did not "disqualify" applicants would not preclude a finding that CoreLogic made housing unavailable through making housing more difficult to obtain.

Overall, the trial court's analysis amounted largely to an opinion that, in the totality of circumstances, the adverse CrimSAFE report was not the proximate

---

[64] MDO p. 37.

[65] MDO pp. 37-39.

[66] MDO pp. 45-46.

cause for why Mr. Arroyo did not gain admission to WinnResidential within a reasonable time after his initial application.[67] This analytical approach appears largely derived from the "cat's paw" theory at issue in *Staub v. Proctor Hospital*—an employment discrimination case in which the plaintiff needed to show that, on the whole, the biased complaints of lower supervisors proximately caused his termination even after independent review by a higher executive.[68] CoreLogic urges this Court to go even further, and rule that non-decisionmaker liability under the cat's paw theory extends only to those who act with intentional discriminatory animus.[69]

Plaintiffs have relied on *Staub* for the broader point that multiple actors can contribute to a discriminatory housing decision, and a landlord's ability to disregard or override an adverse CrimSAFE report does not mean such report cannot deny or otherwise make unavailable housing. But this is not a true "cat's paw" case, in which the discriminatory animus of an agent creates liability for an adverse action taken by the principal.[70] Rather, this action seeks to hold CoreLogic liable only for its *own actions* in making adverse background reports that

---

[67] *See* MDO pp. 37-46.

[68] *See Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011).

[69] *See* CoreLogic Br. 42.

[70] *See Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 273 (2d Cir. 2016) (cat's paw theory derived from agency principles).

19

disproportionately burdened Black and Latino applicants without justification.

Accordingly, the cat's paw, totality-of-circumstances approach was not appropriate for this case. Establishing FHA coverage here required only that CoreLogic's reports had the effect of making housing more difficult for protected class members to obtain; there is no requirement to prove discriminatory intent.[71] An analogous showing (e.g., that the lower supervisors' biased complaints made the plaintiff more likely to be fired) would not have established liability in *Staub*, where no adverse employment action occurred until the termination of employment.[72]

    b.    *The "prevented individualized assessment" standard was erroneous.*

The trial court also applied an erroneous legal standard in ruling that CoreLogic could not have made housing unavailable by enabling landlords to suppress criminal history details from their staff unless CoreLogic or a client

---

[71] *See* 24 C.F.R. § 100.500 ("Liability may be established under the Fair Housing Act based on a practice's discriminatory effect . . . even if the practice was not motivated by a discriminatory intent."); *see also Inclusive Cmtys. Project*, 576 U.S. at 534; *Soules v. U.S. Dep't of Hous. & Urb. Dev.*, 967 F.2d 817, 821 (2d Cir. 1992) ("A plaintiff in stating a claim under the FHA need allege 'only discriminatory effect, and need not show that the decision complained of was made with discriminatory intent.'") (quoting *Yonkers Bd. of Educ.*, 837 F.2d at 1217).

[72] *See Staub*, 562 U.S. at 417-18 (rejecting argument that "an unfavorable entry on the plaintiff's personnel record . . . with discriminatory animus [was] suffic[ient] to establish the tort").

landlord made individualized reviews functionally impossible—i.e., by denying access to entire landlord companies.[73] Such an extreme degree of suppression goes far beyond what is required to make housing more difficult to obtain.

In this case, access to applicants' criminal history details was suppressed from the on-site leasing staff and limited to "selected senior level managers" of WinnResidential.[74] The effect of this limitation was to facilitate instant denials of any applicant for whom an adverse CrimSAFE result was reported.[75] Since the personnel who received the CrimSAFE reports and approved or declined applications were unable to view criminal history details, they could not meaningfully review an application with an adverse result and would simply not admit the applicant.[76] Though the application could potentially be reviewed and approved at later time, the process was uncertain and necessarily delayed.[77]

Based on these effects, the trial court should have found that suppressing the criminal history details from a landlord's leasing staff further burdens applicants

---

[73] *See* MDO pp. 45-46.

[74] MDO ¶¶ 26, 49.

[75] *See Lowman v. Platinum Prop. Mgmt. Servs., Inc.*, 166 F.Supp.3d 1356, 1358 (N.D. Ga. 2016).

[76] MDO ¶¶ 48-49.

[77] *See Lowman*, 166 F.Supp.3d at 1358-60 (denial occurred when applicant was first notified that application had not been approved, even though possibility of admission through additional procedures remained).

for whom CoreLogic has reported adverse CrimSAFE results, and thus otherwise makes housing unavailable for FHA purposes.[78] The trial court should then have proceeded to analyze whether this practice had unjustifiable discriminatory effects.

CoreLogic argues it cannot be held responsible for making adverse CrimSAFE reports to leasing staff from whom criminal history details were suppressed because landlords control which staff can access specific components of CrimSAFE reports. CoreLogic also suggests landlords who followed adverse CrimSAFE results without individualized reviews were misusing the product, because CoreLogic notified landlords about the HUD guidance on individualized review and "required FHA compliance as a matter of contract for all customers."[79] Yet the same CoreLogic also held out CrimSAFE as "automat[ing] the evaluation of criminal records," relieving landlord "staff from the burden of interpreting criminal search results," and delivering "an accept/decline leasing decision."[80] CoreLogic provided landlords with the ability to suppress criminal record details

---

[78] *See Thurmond*, 211 F.Supp.3d at 564.

[79] CoreLogic Br. 33.

[80] MDO ¶¶ 13-14, 17. *See also* Trial Ex. 42, a certificate CoreLogic provided to its customers, stating that the housing provider had demonstrated its commitment to complying with the FHA by using CoreLogic's screening services which meant that "Every lease application is evaluated the same way – every applicant, every time."

from staff and supported landlords in doing so.[81] Most importantly, CoreLogic had control over its own reports and could have refrained from making adverse CrimSAFE reports when configured to suppress criminal history details from leasing staff.

CoreLogic also argues that suppressing criminal history details from leasing staff was justified so that "specially trained managers" could conduct the individualized reviews instead of leasing staff.[82] But nothing in the record suggests CoreLogic allowed landlords to suppress criminal history details from leasing staff only on the condition that such a manager would conduct a review.[83] More importantly, this argument bears on whether the discriminatory impact of suppressing criminal history details was justifiable[84]—not the threshold question of whether that practice burdened housing access at all.

### C. <u>The adverse CrimSAFE report proximately caused the denial of housing to Mr. Arroyo.</u>

CoreLogic next argues the U.S. Supreme Court supposedly "limited FHA applicability and potential liability to those persons whose conduct is the 'direct'

---

[81] MDO ¶¶ 25-26, 33.

[82] CoreLogic Br. 38.

[83] MDO ¶ 33.

[84] *See* 24 C.F.R. § 100.500(b) (practice that has a discriminatory effect does not violate FHA if shown to have a "legally sufficient justification").

23

proximate cause of a housing denial."[85] As discussed above, *Bank of America Corp. v. City of Miami* established a directness standard for proximate cause, it did not limit the range of cognizable adverse housing actions—an actual denial is not necessary.[86] CoreLogic made housing more difficult to obtain by tagging Mr. Arroyo as unqualified in the first instance and requiring him to seek review and reconsideration. Even so, the facts the trial court found establish that CoreLogic did, directly and proximately, cause the denial of his housing application.

1.     <u>The adverse CrimSAFE report directly caused the denial of Mr. Arroyo's application.</u>

Specifically, CrimSAFE reported an unfavorable "Crim Decision" ("Record(s) Found") to WinnResidential leasing agent Melissa Desjardins, who then promptly informed Ms. Arroyo that Mr. Arroyo's application had been declined.[87] This denial could not reasonably be attributed to Desjardins who, as in *Sassower*, merely communicated the bad news to Ms. Arroyo.[88] And there could be no serious question of proximate cause; the denial occurred before there was any reconsideration of the application or even any time or opportunity for a review

---

[85] CoreLogic Br. 22.

[86] *See Bank of Am. Corp.*, 581 U.S. at 203; *see also Thurmond*, 211 F.Supp.3d at 564 (otherwise make unavailable "has been construed to reach every practice which has the effect of making housing more difficult to obtain on prohibited grounds").

[87] MDO ¶¶ 48, 50.

[88] *See Sassower*, 752 F.Supp. at 1187.

24

process to take place.[89] CoreLogic applied the admission policy to its interpretation of Mr. Arroyo's record and substantially caused the denial.

Amicus CDIA argues that CoreLogic's role in the denial was irrelevant because, as a matter of law, only landlords can make admission "decisions."[90] This extreme position is contrary to *Staub* and well-established fair housing doctrine that brokers, leasing staff, and other agents are liable when they deny admission under discriminatory policies set by property owners.[91] The trial court superficially conceded that non-decisionmakers can cause denials, but then concluded that CoreLogic had only a "tenuous" connection to the denial in this case largely because CrimSAFE applied admission criteria chosen by WinnResidential.[92] This amounts essentially to the same argument made by CDIA, and is incorrect for the same reason: if the admission policy was discriminatory, then CoreLogic bears liability for administering it no matter where that policy originated.[93] CoreLogic's recitation of facts buttressing WinnResidential's authorship and control of the

---

[89] *See generally Bank of Am. Corp.*, 581 U.S. at 203.

[90] *See* CDIA Br. 9-13.

[91] *See Staub*, 562 U.S. at 419-20; *see Short*, 916 F.Supp.2d at 399 ("It is well established that agents will be liable for their own unlawful conduct, even where their actions were at the behest of the principal.") (quoting *Jeanty*, 496 F.2d at 1120–21).

[92] MDO pp. 38-39.

[93] *See, e.g.*, *Short*, 916 F.Supp.2d at 399.

policy CoreLogic applied does not save the trial court's analysis from this fatal error of law.

CoreLogic and the trial court also diminish CoreLogic's role in causing the housing denial because WinnResidential could have subsequently reviewed Mr. Arroyo's application and admitted him later.[94] Yet under *Lowman v. Platinum Property Management Services, Inc.*, the only case to specifically analyze *when* a housing denial occurs for FHA purposes, the denial occurred when Melissa Desjardins notified Ms. Arroyo that Mr. Arroyo's application had been declined.[95] Even if WinnResidential had reconsidered and admitted Mr. Arroyo later, that initial denial would still have happened.[96]

Note that *Lowman* found a denial occurred even though the reason was for incomplete information, and the applicant was told he might yet qualify if he submitted the missing items.[97] The denial in this case was even more unequivocal because Ms. Arroyo was not given any option for review or reconsideration upon being told of the denial.[98]

---

[94] MDO pp. 38-41.

[95] *See Lowman*, 166 F.Supp.3d at 1360 ("Defendant has cited no case, and the Court can find none, standing for the proposition that the subsequent approval of an application negates a prior denial for the purposes of the Federal FHA.").

[96] *See id.*

[97] *See id.* at 1359.

[98] MDO ¶ 50.

2. <u>CoreLogic participates directly in discriminatory decisions and has the ability to refrain from doing so, unlike the county defendant in *Mhany*.</u>

Taking a cue from the trial court, CoreLogic analogizes its role in this case to the county defendant in *Mhany*, which declined to exercise a non-binding advisory veto over an underlying discriminatory zoning decision made by the City defendant.[99] But this analogy simply does not hold up because CoreLogic participates actively in rental admission decisions when it makes CrimSAFE reports—it is not a passive bystander, like the county defendant in *Mhany*.[100]

If (as Plaintiffs contend) adverse CrimSAFE reports have disproportionate impacts on Black and Latino renters, that discriminatory effect may be unjustifiable when CrimSAFE is configured to produce adverse results based solely on non-conviction records or crimes that are too old or impertinent to be properly used in light of their disproportionate racial impacts.[101] CoreLogic could avoid causing this discriminatory effect by refraining from making adverse reports

---

[99] *Mhany*, 819 F.3d at 621-23.

[100] *See id.* at 621.

[101] *See, e.g.*, *Fortune Soc'y v. Sandcastle Towers Hous. Dev. Fund Corp.*, 388 F.Supp.3d 145, 177 (E.D.N.Y. 2019) (blanket ban on renting to tenants with criminal records may have unjustifiable disparate impact on Black renters); *see* U.S. Dept. of Hous. & Urb. Dev., Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions at 5-7 (Apr. 4, 2016), https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHASTANDCR.PDF (same).

27

when CrimSAFE is in such configurations. Or, CoreLogic could modify CrimSAFE not to allow such configurations in the first place—as it has done to facilitate compliance with FCRA.[102] There is no need for CoreLogic to review or attempt to veto landlords' admission decisions; CoreLogic has control over its own reports and the CrimSAFE configuration options it offers.[103]

### 3. CoreLogic is liable for its own conduct, whether viewed as making adverse reports when CrimSAFE is configured to deliver unjustifiably discriminatory results, or as permitting such configurations in the first place.

For similar reasons, this Court should also reject CoreLogic's argument—based on a HUD regulation pertaining to liability for discriminatory conduct by a third party[104]—that it has no control over landlords' admission decisions and cannot be held liable for housing discrimination absent such control.

The regulation imposing liability for "[f]ailing to take prompt action to correct and end a discriminatory housing practice by a third-party" principally addresses a landlord's responsibility for addressing "tenant-on-tenant harassment."[105] Those scenarios involve discriminatory conduct that is carried out

---

[102] MDO ¶ 21.

[103] *See* 24 C.F.R. § 100.7(a)(1).

[104] *See* CoreLogic Br. 39 n.10; *see* 24 C.F.R. § 100.7(a)(1)(iii).

[105] *See* 24 C.F.R. § 100.7(a)(1)(iii); *see* Quid Pro Quo and Hostile Environment Harassment and Liability for Discriminatory Housing Practices Under the Fair Housing Act, 81 Fed. Reg. 63054, 63066-63067 (Sept. 14, 2016).

28

entirely by the third party, but where the defendant may have some ability to stop or prevent it; under the rule, liability "depends upon the extent of the person's control or any other legal responsibility the person may have with respect to the conduct of such third-party."[106]

By contrast, this action seeks to hold CoreLogic liable for its own conduct, not that of its client landlords. CoreLogic made adverse CrimSAFE reports that made housing more difficult for affected applicants to obtain, including when CrimSAFE was configured to make adverse reports based only on criminal records that were insufficiently recent or relevant to justify the disparate racial impacts and with the details of those records suppressed from leasing staff. CoreLogic had control over whether it would make those reports. Having done so, CoreLogic bears liability for unjustifiable discriminatory effects those reports caused.[107]

CoreLogic also controlled the screening parameters and configuration options it made available to landlords. CoreLogic could have prevented landlords from using CrimSAFE to make housing unavailable on a discriminatory basis either by disallowing configurations that could result in unjustifiable adverse

---

[106] 24 C.F.R. § 100.7(a)(1)(iii); *see also Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 75 (2d Cir. 2021) ("[S]uch control [cannot] be reasonably presumed to exist in the typically arms-length relationship between landlord and tenant.").

[107] *See* 24 C.F.R. § 100.7(a)(1)(i) ("A person is directly liable for: (i) The person's own conduct that results in a discriminatory housing practice.").

reports or by declining to make adverse reports when such configurations were selected. Hence, even applying the third party discrimination rule, CoreLogic still had sufficient control to have corrected the discrimination.[108]

### D. Evidence in the record supported claims of injury to Plaintiffs.

This Court should also reject CoreLogic's "alternative" argument that the Plaintiffs were supposedly not injured by its discriminatory conduct. The trial court, having dismissed on the threshold basis that CoreLogic is not subject to FHA, did not reach the question of whether or how the plaintiffs were injured. Yet there was plenty of evidence from which the trial court could have, and likely would have, found sufficient injuries had it reached the issue.

As to the Arroyos, when Mr. Arroyo's application was denied, he was excluded from the housing of his choice for a prolonged period of time and only admitted through extensive additional efforts of Ms. Arroyo.[109] The denial disrupted both the Arroyos' living arrangements and caused mental distress.[110]

As to Connecticut Fair Housing Center, CoreLogic expressly waived any challenge to CFHC's standing on the record at trial.[111] Moreover, CFHC's former

---

[108] *See* 24 C.F.R. § 100.7(a)(1)(iii).

[109] MDO ¶¶ 47, 50, 51-56, 59-60.

[110] MDO ¶¶ 52-53; *see also* Trial Tr. Nov. 2, 2022 pp. 960-70.

[111] *See* Trial Tr. Oct. 28, 2022 p. 777-78 ("MS. O'TOOLE: CoreLogic is not challenging CFHC's ability to seek damages for the fair housing violations it's claimed or alleged.

director testified that discriminatory criminal history screening was frustrating CFHC's mission, that CoreLogic was the major culprit, and that CFHC diverted significant resources to counteracting that problem in Connecticut.[112]

## II.   FCRA FILE DISCLOSURE ISSUES

### A.   <u>Plaintiffs' FCRA claim is based on 15 U.S.C. § 1681n.</u>

The Fair Credit Reporting Act ("FCRA") affords every consumer the right to obtain, on request, disclosure of substantially all information that a "consumer reporting agency" (or "CRA") has on file about him at the time of the request.[113] CoreLogic had information on file about Mr. Arroyo at all relevant times and Ms. Arroyo, as Mr. Arroyo's conservator, requested disclosure of that information multiple times between April 27 and November 15, 2016.[114] CoreLogic never made the disclosures.[115]

The Arroyos asserted a claim under 15 U.S.C. § 1681n for willful violation

---

THE COURT: Which means you don't challenge [CFHC's] standing to pursue the claims they have made in this case?

MS. O'TOOLE: That's correct, Your Honor.").

[112] *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (frustration of mission and diversion of resources establish cognizable injury to fair housing organization for Article III standing); *see* Trial Tr. Oct. 28, 2022 pp. 755-60, 762-63, 781-96.

[113] *See* 15 U.S.C. § 1681g(a).

[114] MDO ¶¶ 7, 48, 65-66, 68, 72, 75, 79.

[115] MDO ¶¶ 61-81.

31

of the FCRA file disclosure requirements.[116] In response, CoreLogic argued that Ms. Arroyo never presented "proper identification" to receive Mr. Arroyo's consumer file.[117] Though Ms. Arroyo provided copies of her conservatorship certificate,[118] CoreLogic claimed those copies were insufficient because they did not bear fully-visible impressed seals. The trial court agreed, and ruled on summary judgment that without visible seals, the certificates did not serve as proper identification for CoreLogic to disclose Mr. Arroyo's file to Ms. Arroyo.[119]

Despite persuading the trial court that visible impressed seals were necessary on the copies, however, CoreLogic did not notify Ms. Arroyo of this requirement until several months after she first presented a certificate without a visible seal (and six months after she first requested the disclosure).[120] Instead, CoreLogic repeatedly insisted she provide a different kind of document entirely—a "signed power of attorney"—which Mr. Arroyo had no mental or legal capacity to sign.[121]

The trial court concluded that CoreLogic's willful failure to properly inform

---

[116] *See* 15 U.S.C. §§ 1681g(a), 1681n.

[117] *See* 15 U.S.C. § 1681h(a)(1).

[118] MDO ¶¶ 66-67, 79.

[119] *See* Dkt. No. 194, Mem. of Decision on Mots. for Summ. J. 73 (hereafter "Summ. J. Order"), reported as *Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, 478 F.Supp.3d 259, 307 (D. Conn. 2020).

[120] *See* MDO ¶¶ 65, 67, 78.

[121] *See* MDO ¶¶ 70, 72-73.

32

Ms. Arroyo what additional identification was needed effectively prevented her

from obtaining the file disclosure on Mr. Arroyo's behalf, in violation of 15 U.S.C.

§ 1681g(a).[122] The court therefore awarded statutory damages under 15 U.S.C.

§ 1681n.[123]

**B.**     <u>The trial court's denial of actual damages did not defeat Article III standing over the FCRA file disclosure claim.</u>

CoreLogic contends that because the trial court awarded only statutory

damages and not actual damages, the Arroyos' FCRA claim was without Article III

standing.[124] But actual damages are not necessary to establish standing under

Article III.[125] Rather, standing requires "a concrete and particularized injury caused

by the defendant and redressable by the court."[126] CoreLogic caused a concrete and

particularized injury when it unlawfully withheld Mr. Arroyo's consumer file,

which Ms. Arroyo would have used to challenge the denial of housing

---

[122] MDO p. 55; *see* 15 U.S.C. § 1681g(a).

[123] MDO pp. 49-51.

[124] MDO p. 57.

[125] *See Uzuegbunam v. Preczewski*, 592 U.S. 279, 141 S. Ct. 792, 800 (2021) (if no actual damages, standing may be predicated on nominal damages or other forms of relief).

[126] *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

admission.[127] The injury was redressable through actual or statutory damages.[128] The injury in this case, which denied the Arroyos access to the consumer file altogether and hindered Ms. Arroyo's ability to use the information within that file to advocate for her son's admission to rental housing, was also far more substantial than the asserted injury at issue in *TransUnion LLC v. Ramirez*, on which CoreLogic principally relies.

*Ramirez* held that a "formatting error" in the disclosure of a consumer file, with no associated harm, was not sufficient to establish an injury for Article III standing purposes.[129] *Ramirez* involved "OFAC" alerts, which TransUnion appended to the credit reports of consumers matched to names on a national security watchlist.[130] If a consumer requested a file disclosure, TransUnion provided the underlying credit file first, then the OFAC alert (if any) separately.[131]

---

[127] *See id.* at 441-42 (cognizable injury may occur where plaintiff is denied information altogether *or* suffers "'downstream consequences' from failing to receive the required information"); *see also Kelly v. RealPage Inc.*, 47 F.4th 202, 214 (3d Cir. 2022) (cognizable informational injury occurs where plaintiff is denied the opportunity to use the information for some purpose other than litigation) (citing *Ramirez*, 594 U.S. at 441).

[128] *See* 15 U.S.C. § 1681n(a)(1)(A).

[129] *See Ramirez*, 594 U.S. at 440-41.

[130] *See id.* at 419 ("OFAC is the U. S. Treasury Department's Office of Foreign Assets Control. OFAC maintains a list of 'specially designated nationals' who threaten America's national security. Individuals on the OFAC list are terrorists, drug traffickers, or other serious criminals.").

[131] *See Ramirez*, 594 U.S. at 440.

Though this two-step disclosure violated FCRA, TransUnion argued it did not cause an injury-in-fact because the plaintiffs still received the information, and the improper disclosure format did not actually confuse, frustrate, or otherwise injure them.[132]

The *Ramirez* plaintiffs argued the improper disclosure method created *a risk of future harm*, because a consumer might apply for credit based on the partial initial disclosure, and be denied because of an unknown OFAC alert.[133] But the majority ruled for TransUnion, stating that "plaintiffs put forth no evidence [they] would have tried to correct their credit files—and thereby prevented dissemination of a misleading report—had they been sent the information in the proper format."[134]

In sharp contrast to *Ramirez*, CoreLogic never disclosed Mr. Arroyo's file at all.[135] Failure to disclose information to which a consumer is legally entitled violates the "substantive entitlement" to the disclosure.[136] And unlike the *Ramirez* plaintiffs, ample evidence showed that Ms. Arroyo would likely have used the information to advocate for Mr. Arroyo's admission to the WinnResidential

---

[132] *See id.* at 440.

[133] *See id.* at 441.

[134] *Id*. at 440.

[135] MDO ¶¶ 61-81. *See Ramirez*, 594 U.S. at 441.

[136] *Kelly*, 47 F.4th at 214.

property, had the file been disclosed.[137] Ms. Arroyo pursued her son's admission though "numerous conversations with WinnResidential in 2016 and 2017."[138] She later filed an administrative fair housing complaint.[139] Access to the consumer file would have better enabled Ms. Arroyo to respond to WinnResidential's representative, who cited lack of knowledge as to "the facts behind the criminal background findings" and "trust in the [CrimSAFE] results" as the reasons for denying Mr. Arroyo's admission.[140] CoreLogic argues these efforts would not have been successful in securing Mr. Arroyo's admission, and perhaps not. But merely that she would have tried is more than sufficient to establish adverse secondary effects.[141]

CoreLogic also relies on *Harty v. West Point Realty, Inc.*, an Americans with Disabilities Act ("ADA") claim against a hotel for failing to include mandatory accessibility information on its website.[142] In *Harty*, this Court ruled that, even if denied information the ADA entitled him to receive, the plaintiff "must also allege

---

[137] *See* MDO ¶¶ 51, 54-59.

[138] MDO ¶ 51.

[139] MDO ¶ 56.

[140] MDO ¶ 57.

[141] *See Ramirez*, 594 U.S. at 440; *see also Kelly*, 47 F.4th at 215 (mere opportunity to take action based on withheld information established informational injury).

[142] *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 440 (2d Cir. 2022).

'downstream consequences from failing to receive the required information' in order to have an Article III injury in fact."[143] By "downstream consequences," however, the Court meant only some use for the information beyond bringing a lawsuit.[144]

The *Harty* plaintiff was unable to show downstream consequences because he never intended to actually visit the hotel, and was simply "monitor[ing] whether places of public accommodation and their websites comply with the ADA."[145] But Ms. Arroyo sought the information for use in trying to persuade WinnResidential to admit her son. She also could have used the file disclosure to pursue dismissal of the Mr. Arroyo's pending theft charge, which she later did after learning about it through other means.[146] Hence the denial of the file disclosure caused "downstream consequences" more than adequate for Article III standing.

C. **The trial court properly held CoreLogic liable for willfully violating 15 U.S.C. § 1681g and awarded statutory damages under 15 U.S.C. § 1681n.**

The trial court properly found CoreLogic willfully violated Mr. Arroyo's right, under FCRA, to disclosure of his consumer file. CoreLogic committed that violation by withholding the file from his conservator, Ms. Arroyo, and not

---

[143] *Id*. at 444 (citing *Ramirez*, 594 U.S. at 442).

[144] *Id.* (quoting *Laufer v. Looper,* 22 F.4th 871, 880 (10th Cir. 2022)).

[145] *Id*. at 440.

[146] MDO ¶ 55.

reasonably informing her of what additional identification materials she needed to obtain it.[147] While this was not the same theory on which Plaintiffs originally conceived of their FCRA file disclosure claim,[148] this reasoning was perfectly sound.[149] CoreLogic has presented no argument why 15 U.S.C. § 1681g(a) does not imply a duty to notify a consumer what additional identification materials are needed, after withholding a file disclosure for lack of adequate identification. And FCRA implementing Regulation V, which applies to "nationwide specialty consumer reporting agenc[ies]" like CoreLogic, specifically requires this:

> In the event that a consumer requesting a file disclosure cannot be properly identified in accordance with the FCRA . . . provid[e] a statement that the consumers identity cannot be verified; and directions on how to complete the request, including what additional information or documentation will be required to complete the request, and how to submit such information.[150]

CoreLogic complains that Regulation V does not provide a private cause of action. That may be, but the Plaintiffs' cause of action arose from 15 U.S.C. § 1681n, based on CoreLogic's violation of 15 U.S.C. § 1681g(a). Plaintiffs never

---

[147] MDO pp. 52-54.

[148] As discussed in their opening brief, the Arroyos maintain that visible impressed seals are not necessary on copies of conservatorship certificates to fulfill the FCRA's "proper identification" requirement so long as the original documents bore the seals.

[149] *See generally Woods v. Dunlop Tire Corp.*, 972 F.2d 36, 39 (2d Cir. 1992) ("[I]dentity of facts surrounding the occurrence … constitutes the cause of action, not the legal theory upon which [plaintiff] chose to frame her complaint.").

[150] 12 C.F.R. § 1022.137(a)(2)(iii)(C).

pleaded a claim under Regulation V and cited it only as authority for the correct interpretation of CoreLogic's file disclosure obligations; the trial court also made very clear it would not impose liability based on a violation of this regulation.[151] Rather, the trial court simply interpreted FCRA in a consistent manner—i.e., as implying a duty not to thwart a consumer's right to a file disclosure by failing to inform (or actively misleading, as in this case) them of identification requirements.[152]

CoreLogic's unfair surprise argument badly misstates the procedural history of the case. The trial court never dismissed the Arroyos' statutory file disclosure claim; rather, the court rejected the Arroyos' theory of liability and stated they could only prevail on that claim by proving the alternative theory, that CoreLogic failed to seasonably advise Ms. Arroyo of the additional identification requirements needed to obtain the disclosure.[153] The trial court explained at length that it did not, as CoreLogic claims, "allow[] Mr. Arroyo to proceed to trial on an un-plead claim under the FCRA's implementing regulation – 12 C.F.R.

---

[151] MDO pp. 49-51.

[152] MDO pp. 51-53.

[153] Summ. J. Order 77 (denying summary judgment on FCRA claim because "there is a disputed question of fact as to whether [CoreLogic] acted 'objectively unreasonably' in failing to provide accurate directions on how to complete Ms. Arroyo's request on behalf of Mr. Arroyo, including what additional information or documentation would be required to complete the request, and how to submit such information").

§ 1022.137(a)(2)(iii)(C)."[154]

As the trial court's summary judgment ruling fully explained what FCRA claims could proceed to trial, CoreLogic had ample notice of the court's ultimate theory of liability under 15 U.S.C. § 1681n, and CoreLogic's claim of unfair surprise has no merit. Equally specious is CoreLogic's contention that it would have presented more or different evidence on the file disclosure question had it understood the theory of liability in play. CoreLogic's only witness on the file disclosure issues, Angela Barnard, had no personal knowledge of communications between CoreLogic and Ms. Arroyo; the trial court disregarded her testimony and relied exclusively on CoreLogic's internal notes.[155] CoreLogic has given no hint of what other evidence it might have presented on this question, or how such evidence might possibly have altered the outcome.

## III.   DISPARATE IMPACT BASED ON DISABILITY

The trial court erred in dismissing, on summary judgment, Plaintiffs' disparate impact claim over CoreLogic's policy of requiring persons seeking third parties' consumer files to present a "power of attorney" signed by that consumer. Conserved persons like Mr. Arroyo legally cannot confer power of attorney ("POA") and are thus predictably and necessarily denied access to their consumer

---

[154] CoreLogic Br. 20; *see* MDO pp. 49-51.

[155] MDO ¶ 71.

files under CoreLogic's policy, placing them at a disadvantage in challenging housing denials on the basis of their consumer files.

**A.** **Plaintiffs were not required to show a denial of housing to succeed on their claim under 42 U.S.C. § 3604(f).**

As the trial court found after the bench trial, CoreLogic had a facially neutral policy of requiring third parties seeking disclosure of another individual's consumer file to have a POA.[156] CoreLogic's policy necessarily prevented third parties seeking disclosure of files of conserved persons like Mr. Arroyo from getting access, as conserved persons legally cannot give another person POA.[157] In preventing equal access to their consumer files in this way, CoreLogic denied conserved persons an equal opportunity to pursue rental housing by disputing improper screening report contents or appealing denials by landlords. This is actionable under 42 U.S.C. § 3604(f), which makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling" on the basis of that person's disability, or the disability of a person intending to reside in the dwelling.[158]

---

[156] MDO ¶¶ 64, 70, 72-73.

[157] MDO ¶ 73.

[158] 42 U.S.C. § 3604(f)(2).

1.  It is not necessary to show that discrimination produced
    housing denials, only that the challenged policy disadvantaged
    persons with disabilities in connection with housing-related
    services.

Plaintiffs met their burden of showing that CoreLogic's policy produced a

discriminatory impact on persons with disabilities in connection with housing-

related services. Contrary to CoreLogic's argument, to succeed on a claim under

section 3604(f)(2) does not require showing that the discrimination produced

housing denials.[159] A prima facie disparate impact claim requires showing "(1) the

occurrence of certain outwardly neutral practices, and (2) a significantly adverse or

disproportionate impact on persons of a particular type produced by the

defendant's facially neutral acts or practices."[160]  Accordingly, Plaintiffs had to

show that a facially neutral practice by CoreLogic "actually or predictably

result[ed] in discrimination" in the provision of services in relation to the rental or

sale of a dwelling.[161] As Plaintiffs demonstrated at summary judgment and the

district court found after trial, CoreLogic provided tenant-screening services that

related closely to housing and any conservator who sought disclosure of a

conserved person's consumer file from CoreLogic to challenge an adverse housing

---

[159] *See* CoreLogic Br. 49.

[160] *See Mhany*, 819 F.3d at 617.

[161] *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir. 2003)
(quotations and ellipsis omitted).

decision would predictably be denied access under the POA policy.[162]

## 2. CoreLogic's policy produces an adverse impact on disabled persons' access to housing.

Discrimination by ancillary housing services violates the FHA because it forces people in protected categories to seek or maintain housing from a disadvantaged position.[163] That is the case here, where a consumer would generally seek their file to challenge an adverse housing decision, meaning CoreLogic's POA requirement imposed such a heightened barrier to housing admission for conserved persons. It is of no moment that CoreLogic provides housing services without being a housing provider; while "the majority of cases under § 3604(b) involve providers of housing who are also responsible for the services associated with the dwelling, the text of § 3604(b) does not limit its applicability in such a manner."[164]

---

[162] *See* MDO ¶ 73.

[163] *See, e.g., Davis v. Money Source Inc.*, No. 21-cv-00047, 2021 WL 3861908, at *4-9 (D. Conn. Aug. 30, 2021) (upholding FHA claims against mortgage servicer); *Louis*, 2023 WL 4766192, at *8-9 (plaintiffs plausibly alleged that third party tenant screening service violated FHA); *Wai v. Allstate Ins. Co.*, 75 F.Supp.2d 1, 7-8 (D.D.C. 1999) (complaint alleging that insurance company withdrew insurance quote from landlord after learning disabled tenants lived in the dwelling stated claims under section 3604(f)).

[164] *Ga. State Conf. of the NAACP v. City of LaGrange*, 940 F.3d 627, 635 (11th Cir. 2019) (rejecting argument that FHA inapplicable to city because it was "a third-party provider of services and 'a stranger to each individual Plaintiff's sale or rental transaction'"). Section 3604(f)(2) is the analog of section 3604(b), prohibiting the same forms of discrimination set forth in section 3604(b), against

43

Consumer reporting agencies like CoreLogic cannot deny the real – and entirely predictable – impacts that discriminatory policies have on disabled consumers like Mr. Arroyo, including that they will be deterred or prevented from challenging housing denials by its client landlords. Indeed, "[i]n enacting the FCRA, Congress recognized 'the crucial role that consumer reporting agencies play in collecting and transmitting consumer credit information, and the detrimental effects inaccurate information can visit upon both the individual consumer and the nation's economy as a whole.'"[165] Congress has determined that access to these files is of vital importance to consumers, and the facts here show Congress was correct.

As discussed above in Section II.A and below in Section III.B, Plaintiffs presented ample evidence at summary judgment that CoreLogic had a policy of requiring a POA that conserved persons could not provide. Further, contrary to CoreLogic's assertion,[166] Plaintiffs demonstrated at summary judgment that CoreLogic's policy predictably produced an adverse impact on access to housing-related services. And as the district court held, Plaintiffs adduced sufficient evidence at summary judgment to allow a reasonable factfinder to conclude that

disabled individuals.

[165] *Adams v. Nat'l Eng'g Serv. Corp.*, 620 F.Supp.2d 319, 326 (D. Conn. 2009) (citation omitted).

[166] CoreLogic Br. 49-50.

44

WinnResidential likely would have allowed Mr. Arroyo to move in earlier if Ms. Arroyo had been able to access Mr. Arroyo's consumer file.[167]

Citing no on-point authority, CoreLogic asserts Plaintiffs were required to "support any claim regarding what WinnResidential would have done with testimony from *WinnResidential*."[168] This is not the law; rather, "evidence is 'relevant' if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'"[169] In any case, Plaintiffs did present evidence that WinnResidential's concern about admitting Mr. Arroyo was focused on the question of what was in CoreLogic's file on him in the form of testimony by a WinnResidential employee, a WinnResidential employee's email, and a verified filing from WinnResidential, in support of their summary judgment motion.

At summary judgment, Plaintiffs presented WinnResidential employee testimony that the "crux" of the issue in WinnResidential not admitting Mr. Arroyo was that they were "not provided information related to what [the Arroyos] were attempting to have waived," namely, the criminal history CoreLogic flagged in the

---

[167] *See* Summ. J. Order 71-73.

[168] CoreLogic Br. 49.

[169] *See United States v. Abu-Jihaad*, 630 F.3d 102, 132 (2d Cir. 2010) (quoting Fed. R. Evid. 401).

CrimSAFE report.[170] A factfinder could infer that access to Mr. Arroyo's file would have enabled Ms. Arroyo to show the WinnResidential employees who denied Mr. Arroyo's application his criminal record, enabling them to consider overriding the denial.

Ms. Arroyo ultimately independently located the criminal history CoreLogic's CrimSAFE report relied on and provided it to WinnResidential. As evidenced by an email Plaintiffs presented at summary judgment, WinnResidential did not accept Plaintiffs' submission because WinnResidential was not sure whether that record was the same one for which CoreLogic disqualified Mr. Arroyo.  In the email to CoreLogic, a WinnResidential employee asks whether there was any way to determine whether the arrest record Ms. Arroyo provided was the same as the record underlying CoreLogic's CrimSAFE report.[171] Access to Mr. Arroyo's file when requested would have avoided this issue. Moreover, in WinnResidential's sworn Answer to the Arroyos' CHRO Complaint, which

---

[170] Dkt. No. 116-35, June 13, 2017 CHRO Hr'g Tr. 52:14-24.

[171] Dkt. No. 105-11, May 8, 2017, Email from M. Cunningham. Further, as CoreLogic emphasizes in its briefing, *see* CoreLogic Br. 46-47, WinnResidential changed its criteria for housing denials based on criminal records shortly after denying housing to Mr. Arroyo, such that Mr. Arroyo's arrest was no longer disqualifying. Trial Tr. Mar. 15, 2022 179:24-180:14. Had the Arroyos been able to show WinnResidential the basis for CoreLogic's report, WinnResidential would have seen that the arrest on his record did not warrant a denial under its updated standards.

Plaintiffs put forth at summary judgment, WinnResidential stated that it did "not know the facts behind the criminal background findings" and that it hired a third party vendor to perform background checks and "trust[s] in the results [it is] given and therefore make[s its] decisions based on these results."[172] This evidence would permit a reasonable factfinder to conclude that Mr. Arroyo would likely have been able to successfully secure housing with WinnResidential sooner had CoreLogic disclosed Mr. Arroyo's file to Ms. Arroyo for use in challenging the denial.

Finally, CoreLogic's argument that WinnResidential was informed of Mr. Arroyo's disability on many occasions without changing its decision[173] only proves Plaintiffs' point: WinnResidential made clear that it would not, and it in fact did not, admit Mr. Arroyo without seeing the criminal history information underlying the CrimSAFE report.

**B.** **Plaintiffs' evidence of a categorically discriminatory policy was sufficient to show CoreLogic predictably discriminated against disabled individuals.**

Plaintiffs' burden in bringing a disparate impact claim is to show that CoreLogic's practice or policy "actually *or* predictably" discriminated against disabled individuals.[174] Plaintiffs made this showing by demonstrating that

---

[172] Dkt No. 105-6, CHRO WinnResidential Answer ¶ 28.

[173] CoreLogic Br. 50.

[174] *Tsombanidis*, 352 F.3d at 575 (quotations omitted) (emphasis added).

47

CoreLogic's policy of requiring a POA necessarily discriminates against conserved persons. As the district court found, "[s]tatistics are not necessary if a challenged policy categorically applies to a protected class."[175]

At summary judgment, the district court improperly found that CoreLogic did not have a policy of requiring third parties to submit a POA executed by the consumer in order to receive the consumer file.[176] In so finding, the district court resolved a factual issue against the non-moving party.[177] The district court's findings following trial underscore the extent to which its summary judgment ruling on this issue was in error. At trial, based on substantially the same evidence set forth at summary judgment, the district court found that CoreLogic willfully violated FCRA because its policy "only identifies a power of attorney as a means of validating a third party's agency over the consumer," and therefore "entirely overlooked" persons lacking capacity to designate an agent "with the effect of

---

[175] Summ. J. Order 79 (citing 24 C.F.R. § 100.500(a)); *see also Cripe v. City of San Jose*, 261 F.3d 877, 894 (9th Cir. 2001) (evidence of policies that rendered disabled individuals categorically ineligible for certain positions and promotions sufficient to survive summary judgment on ADA claims).

[176] Summ. J. Order 80.

[177] *See R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 58 (2d Cir. 1997) ("[A]t the summary judgment stage the court should not 'weigh' the evidence in the same manner as a trier of fact …. [T]he court must still construe the reasonable inferences in favor of the non-moving party.") (citations omitted).

48

denying Mr. Arroyo his right to his consumer report."[178] These rulings are plainly inconsistent and cannot stand. A ruling for Plaintiffs on this issue at trial – where there was no requirement to weigh the evidence in either party's favor – necessarily demonstrates that a ruling against Plaintiffs at summary judgment on the same issue – when all reasonable inferences were to be drawn in Plaintiffs' favor – was erroneous.

Plaintiffs amply supported their disparate impact claim at summary judgment with evidence that CoreLogic had a policy of requiring a power of attorney for third parties seeking consumer files. Evidence in the summary judgment record showed that CoreLogic repeatedly determined that Ms. Arroyo would need to have a power of attorney to get Mr. Arroyo's consumer file, and told her so.[179] Further evidence supporting Plaintiffs' claim that CoreLogic had a policy of requiring a POA includes CoreLogic's policy handbook, which lists a valid POA or limited POA as a requirement for accepting a third party request[180] and a CoreLogic employee's 30(b)(6) deposition testimony.[181]

---

[178] MDO p. 55.

[179] *See* Dkt. No. 87-3, Decl. of Carmen Arroyo ¶¶ 14-16; Dkt. No. 114-6, Ex. B to Decl. of Angela Barnard at ARROYO000453.

[180] *See* Dkt No. 114-6, Ex. A to Decl. of Angela Barnard, CoreLogic Handbook at ARROYO001706 § 2.3.2.

[181] *See* Dkt. No. 105-3, Barnard Dep. 72:3-73:1.

CoreLogic argues that its policy was to escalate to a supervisor any scenario where the policy's requirements (including POA) could not be met, and thus it did not enforce the power of attorney requirement on conservators.[182] In fact, however, the evidence at summary judgment showed that the supervisor review merely directed application of the POA requirement. Ms. Arroyo was told that she needed a POA, even after the CoreLogic employee had apparently consulted with "management."[183] Indeed, Ms. Arroyo's request was not internally elevated to "legal" until November 2016 – nearly seven months after her initial request (and only after she had independently consulted an attorney).[184] And after trial, the court

---

[182] CoreLogic Br. 51.

[183] *See, e.g.*, Dkt. No. 114-6, Ex. B to Decl. of Angela Barnard, Notes of Sept. 7, 2016 Call at ARROYO000454 ("Consumer mother called back, asked if we received fax docs from 06-2016. Advised yes and per management unable to use information. Per SOP need power of attorney or limited power of attorney."). This evidence was before the district court at summary judgment, *see* Dkt. No. 114-6, and the district court relied heavily on these notes of calls in its decision at trial. *See* MDO p. 27 n.6 ("The Court does not credit Ms. Barnard's interpretation of the internal notes because she was not the author of any of the notes and several of her characterizations were directly inconsistent with the plain statements made in the notes. The Court will determine what was stated during the calls based on the notes.").

[184] *See* Dkt. No. 114-6, Ex. B to Decl. of Angela Barnard, Notes of Nov. 1, 2016 Call at ARROYO000455 ("Advised … we have to get legal's approval [*sic*] before we could send out the report.").

Plaintiffs presented evidence at summary judgment that people with disabilities comprise only 11% of Connecticut's population, but comprise 100% of those harmed by CoreLogic's policy. *See* Dkt. No. 87-10, Expert Report of Nancy Alisberg at 4-9. Every conserved person in Connecticut for whom a report from CoreLogic was requested would be harmed in the same way. Defendant asserts

50

ruled CoreLogic's written file disclosure policy "only identifies a power of attorney as a means of validating a third party's agency over a consumer. Nothing in the policy identifies circumstances such as Mr. Arroyo's—when someone suffers from a lack of capacity to designate an agent," which the court found to be an "entirely foreseeable circumstance as many people are subject to conservatorships (also known as guardianships in some states) [and] [i]n many cases, including Mr. Arroyo's, a person can lack physical and/or mental capacity to make a valid power of attorney."[185]

Disparate impact liability under the FHA "permits plaintiffs to counteract

---

there were no other conserved persons for whom reports were requested. CoreLogic Br. 50. However, there is at least a disputed question of fact on that point. CoreLogic cites to the declaration of CoreLogic official Angela Barnard to support its claim. However, in her 30(b)(6) deposition, Barnard admitted that CoreLogic does not track third party consumer file requests and thus has no way of knowing how often conservators seek files. *See* Dkt No. 105-1, Pls' Additional Undisputed Facts ¶ 45; *see also* Dkt. No. 107-1, Barnard Dep. 112:2-18, 120:23-121:18, 121:25-124:24. Barnard also admitted that the employee she consulted as the source for her statement that this was the only request based on a conservatorship did not have knowledge on the subject predating 2015 or 2016. Dkt. No. 107-1, Barnard Dep. 121:4-18. There was sufficient evidence before the court at summary judgment for a reasonable factfinder to conclude that Barnard's assertion that CoreLogic had never encountered a conserved person before was unfounded. (CoreLogic also cites to the trial transcript for this point, *see* CoreLogic Br. 50, but on appeal of the district court's summary judgment ruling this Court may only consider materials before the district court at summary judgment. *See Griffin v. Sirva Inc.*, 835 F.3d 283, 287 (2d Cir. 2016)).

[185] MDO p. 55.

unconscious prejudices and disguised animus . . . ."[186] CoreLogic, which had a duty to disclose Mr. Arroyo's consumer information to Ms. Arroyo, did not do so because its written and implemented policies did not contemplate the existence of conserved persons, who are unable to execute powers of attorney. The Arroyos' experience with CoreLogic is a predictable result of this policy. This is precisely the kind of "unconscious prejudice[]" disparate impact claims are designed to address.

### C. CoreLogic misstates Plaintiffs' proposed less discriminatory alternative.

For a less discriminatory alternative, Plaintiffs proposed CoreLogic could make consumer file disclosures to conservators who request disclosures on behalf of conserved persons, rather than require conservators to provide POA. This alternative would substantially eliminate the discriminatory effect without imposing any material burden on CoreLogic.[187]

CoreLogic mischaracterizes Plaintiffs' proposed less-discriminatory alternative as requiring CoreLogic to accept documentation lacking impressed seals. This argument seeks to conflate Plaintiffs' arguments about FCRA

---

[186] *Inclusive Cmtys. Project*, 576 U.S. at 540.

[187] *See* 24 C.F.R. § 100.500(b)(1)(ii) (discriminatory practice has no legally-sufficient justification where the defendant's interests could "be served by another practice that has a less discriminatory effect").

requirements and reasonable accommodations with their proposed less discriminatory alternative for disparate impact purposes. The discriminatory practice here being challenged is CoreLogic's refusal to make file disclosures to any third person without a POA, not the identification requirements that would have applied had CoreLogic been willing to make file disclosures to a conservator. Plaintiffs did not, for purposes of their disparate impact claim, assert that the less discriminatory alternative was for CoreLogic to adopt a general policy of accepting documents without impressed seals.

Because of this mischaracterization, CoreLogic's only objection to Plaintiffs' proposed alternative is that it supposedly conflicts with CoreLogic's "legitimate interest in obeying the law."[188] But CoreLogic does not dispute that conservators legally have the authority to seek consumer files on behalf of the conservatee; a policy of accepting conservatorships in lieu of powers of attorney by third parties seeking file disclosures on behalf of conserved persons would not violate any law that CoreLogic has identified.

## IV. REASONABLE ACCOMMODATION CLAIM

Plaintiffs presented ample evidence at summary judgment demonstrating that CoreLogic was aware of Mr. Arroyo's disability and reasonably could have accommodated him but failed to do so.

---

[188] CoreLogic Br. 53.

53

**A.**     <u>Mr. Arroyo's reasonable accommodation claim is not a claim for failure to engage in the interactive process.</u>

Contrary to CoreLogic's assertion,[189] Plaintiffs have never characterized Mr. Arroyo's reasonable accommodation claim as a mere failure to engage in the interactive process. Ms. Arroyo requested a specific accommodation when she asked CoreLogic to provide Mr. Arroyo's file to her as his conservator.[190] As Plaintiffs have consistently argued,[191] they seek to hold CoreLogic liable for failing to make that accommodation.

Plaintiffs set forth evidence at summary judgment that CoreLogic repeatedly told Ms. Arroyo that, to receive disclosure of Mr. Arroyo's consumer file, she needed to present a POA signed by him. It was over six months after Ms. Arroyo initially contacted CoreLogic that CoreLogic informed her that she needed to send a certificate with a "visible" seal.[192] This, along with other evidence adduced by

---

[189] *See* CoreLogic Br. 58.

[190] *See Higgins v. 120 Riverside Blvd. at Trump Place Condo.*, No. 21-cv-4203, 2021 WL 5450205, at *6 (S.D.N.Y. Nov. 19, 2021) (noting that the plaintiff "did not need to use the 'magic words' of 'reasonable accommodation' or the 'Fair Housing Act'" to trigger a defendant's duty to provide an accommodation) (quotation marks and citation omitted).

[191] *See, e.g.*, Plaintiffs' Opening Br. 51 ("[Mr. Arroyo] needed CoreLogic to make an accommodation—disclose the consumer file to his conservator without requiring a power of attorney, just as [Ms.] Arroyo requested."); Dkt. No. 87-1, Pls' Mot. for Partial Summ. J. 3 ("CoreLogic has also failed without excuse to grant exceptions from [its policy of requiring a power of attorney] in accordance with its duty to make reasonable accommodations.").

[192] *See* Dkt. No. 114-6, Ex. B to Decl. of Angela Barnard, Notes of Nov. 14,

Plaintiffs, was sufficient for a factfinder to conclude that CoreLogic failed to disclose Mr. Arroyo's consumer file to Ms. Arroyo because of adherence to its policy requiring a POA, rather than from its now-claimed "impressed seal" requirement. Had CoreLogic been willing to accommodate Mr. Arroyo, but genuinely concerned about the lack of an impressed seal, CoreLogic would have so notified Ms. Arroyo much sooner and would not have repeated the POA requirement in well into September 2016.

### B.    Plaintiffs showed that Mr. Arroyo was likely denied an equal opportunity to enjoy the housing of his choice.

The FHA prohibits "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a person with a disability] equal opportunity to use and enjoy a dwelling."[193] As the Second Circuit set forth in *Tsombanidis*, the requisite showing for a reasonable accommodation claim is that "but for the accommodation, they *likely* [were] denied an equal opportunity to enjoy the housing of their choice."[194] CoreLogic overstates the holding of an unpublished out-of-Circuit case to argue

---

2016 Call at ARROYO000456; *see also* MDO pp. 52-53 (finding CoreLogic willfully violated FCRA and noting that CoreLogic "did not direct Ms. Arroyo to submit [a certificate] with an original seal" but rather required her to send a POA even after she had provided the copy of her certificate).

[193] 42 U.S.C. § 3604(f)(3)(B).

[194] *Tsombanidis*, 352 F.3d at 578 (emphasis added) (citation omitted).

that Plaintiffs were required to show that the requested accommodation would *necessarily* have resulted in Mr. Arroyo's admission.[195] Plaintiffs were not required to prove the counterfactual world to a certainty. Moreover, the *Dayton Veterans* court ultimately applied a substantially similar standard to the Second Circuit's.[196]

Plaintiffs adduced more than enough evidence to make the requisite showing at summary judgment. The object of the FHA's necessity requirement "is a level playing field in housing for the disabled."[197] CoreLogic's policy of requiring a POA and failure to accommodate Mr. Arroyo's disability hampered the Arroyos in disputing the denial of housing caused by CoreLogic's report.[198] Mr. Arroyo was thus denied an equal opportunity to seek admission at WinnResidential because of his disability. He was forced to seek housing from a disadvantaged position rather

---

[195] *See* CoreLogic Br. 58 (citing *Dayton Veterans Residences Ltd. P'ship v. Dayton Metro. Hous. Auth.*, No. 22-3935, 2023 WL 8081677, at *6 (6th Cir. Nov. 21, 2023) (unpublished)).

[196] *See Dayton Veterans*, 2023 WL 8081677, at *6 ("Freedom's Path needed to show that, but for the accommodation it sought, disabled veterans would likely have been denied an equal opportunity to access housing.").

[197] *Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*, 685 F.3d 917, 923 (10th Cir. 2012).

[198] *See Logan v. Matveevskii*, 57 F.Supp.3d 234, 267 (S.D.N.Y. 2014) (unreasonable delay in addressing request for reasonable accommodation may constitute constructive denial); *see also Menton v. Experian Corp.*, No. 02 Civ. 4687, 2003 WL 941388, at *3 (S.D.N.Y. Mar. 6, 2003) ("[A] seven-month delay constitutes an intentional failure on the part of Experian to provide a credit report.").

56

than a "level playing field." Further, as set forth in section III.A *supra*, Plaintiffs showed that WinnResidential likely would have permitted Mr. Arroyo to overturn the denial of his application sooner had the Arroyos been able to obtain Mr. Arroyo's file from CoreLogic in a timely fashion.

## C. Accepting a copy of the conservatorship certificate would also have been a reasonable accommodation.

The district court erred in concluding that accepting Ms. Arroyo's conservatorship certificate would not have been a reasonable accommodation because it lacked an impressed seal. Consumer reporting agencies are required to disclose consumer files upon request[199] if the consumer has furnished "proper identification."[200] Proper identification is documentation sufficient to verify the consumer's identity and need not take the form requested by the reporting agency.[201] The conservatorship certificate had sufficient verifiable details to permit CoreLogic to confirm Ms. Arroyo's authority, including the court name, case caption, and case number.[202]

---

[199] *See* 15 U.S.C. § 1681g.

[200] *Id.* § 1681h.

[201] *See Menton*, 2003 WL 941388, at *3.

[202] CoreLogic emphasizes amendments to Connecticut's conservatorship statute to preserve "the most independence and self-determination for the conserved person," CoreLogic Br. 56 n.20, but these amendments are not relevant to CoreLogic's duties under FCRA. The argument CoreLogic appears to be making – that it would have needed to be *less* rigorous in verifying the authenticity of a plenary conservatorship than a limited one – is nonsensical.

57

CoreLogic has put forth no authority for its contention that verifying the certificate via these details would be "overrid[ing] the court-imposed requirement of an impressed seal" or that its insistence on a "valid" certificate was reasonable.[203] A photocopy of a driver's license is not itself a valid driver's license, but consumer reporting agencies routinely accept such copies for identification purposes.[204] Scans of identifying documents do not purport to be original documents themselves; rather, the "photocopy show[s] that the [consumer] ha[s] a license."[205]

Ms. Arroyo provided CoreLogic with identification sufficient for CoreLogic to confirm her legal authority to seek Mr. Arroyo's consumer file. Rather than accommodate Mr. Arroyo's disability by allowing a departure from its POA requirement, CoreLogic insisted that Ms. Arroyo obtain a POA from Mr. Arroyo

---

[203] *See* CoreLogic Br. 56.

[204] *See, e.g.*, *Middlebrooks v. Experian Info. Sols., Inc.*, No. 20-CV-2279, 2020 WL 9600586, at *1 (N.D. Ga. Nov. 3, 2020) (noting that Experian "required additional information to verify Plaintiff's identity before producing her report, including a copy of her driver's license"); *Danehy v. Experian Info. Sol., Inc.*, No. 18-CV-17, 2018 WL 4623647, at *2 (E.D.N.C. Sept. 26, 2018) (noting that Trans Union sent plaintiff a personal credit report after plaintiff sent in, inter alia, "identification in the form of a copy of his current state driver's license and social security card").

[205] *See Sulkowska v. City of N.Y.*, 129 F.Supp.2d 274, 288 (S.D.N.Y. 2001) (regarding liquor license). Further, as the cases Plaintiffs cited in their opening brief demonstrate, courts regularly find that the lack of an impressed seal on a photocopy is immaterial as long as the original document has the required seal. *See* Plaintiffs' Opening Br. 53 n.206.

that he was unable, due to his disability, to confer. Now, CoreLogic argues that it could not have accommodated Mr. Arroyo because accepting a copy of the conservatorship certificate without an impressed seal was not a reasonable accommodation. Not only is this plainly a post hoc rationalization for CoreLogic's failure to depart from its POA policy, it would have been both reasonable and routine for CoreLogic to accept a copy of an identifying document with the understanding that the photocopy was proof that the sender had a valid original document.

## V.    CONCLUSION

For the foregoing reasons, as well as those stated in Plaintiffs' Opening Brief, this Court should reverse the trial court's decision that adverse CrimSAFE reports do not make unavailable or deny housing, and remand for determination of whether such reports do so on an unlawfully discriminatory basis. The Court should also reverse the summary judgment order dismissing the disability disparate impact and reasonable accommodation claims, and remand for further proceedings on those claims as well.  Finally, this Court should affirm the district court's judgment in favor of Plaintiffs on their FCRA claims.

Respectfully Submitted this 16th day of April, 2024,

| /s/ Eric Dunn | /s/Christine Webber | /s/Greg Kirschner |
|---|---|---|
| Eric Dunn | Christine Webber | Greg Kirschner |
| **National Housing Law Project** | **Cohen Milstein Sellers & Toll PLLC** | **Connecticut Fair Housing Center** |
| 919 E. Main Street | 1100 New York Ave NW | 60 Popieluszko Ct. |
| Suite 610 | Suite 500 | Hartford, CT 06106 |
| Richmond, VA 23219 | Washington, D.C. 20005 | (860) 263-0724 |
| (415) 546-7000 | (202) 408-4600 | greg@ctfairhousing.org |
| edunn@nhlp.org | cwebber@cohenmilstein.com | |

60

## CERTIFICATE OF COMPLIANCE WITH RULE 32(g)(1)

This document complies with the type-volume limit of FRAP 32(g)(1) and the word limitation of LR 28.1.1 because, excluding those portions of the document exempted by FRAP 32(f), the document contains 13727 words.

This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

*/s/Christine Webber*
Christine Webber

## CERTIFICATE OF SERVICE

I hereby certify that on April 16, 2024, I electronically filed the foregoing Brief using the Court's CM/ECF system, which will automatically send copies to all counsel of record pursuant to LR 25.1(d)(1).

*s/Christine Webber*
Christine Webber
